AYUDA, INC., et al.

v.

Richard THORNBURGH, Individually, and as Attorney General of the United States, et al., Appellants. (Two Cases)

AYUDA, INC., et al., Appellants,

v.

Richard THORNBURGH, et al.

Nos. 88–5226, 90–5293 and 89–5301.

United States Court of Appeals, District of Columbia Circuit.

Argued May 16, 1991.

Decided Nov. 5, 1991.

Donald E. Keener, Atty., Dept. of Justice, with whom Stuart M. Gerson, Asst. Atty. Gen., and Robert Kendall, Jr., Asst. Director of Immigration Litigation, Dept. of Justice, Washington, D.C., were on the brief, for appellants in 88–5226 and 90–5293 and appellees in 89–5301. David J. Kline and John R. Bolton, Attys., Dept. of Justice, Washington, D.C., also entered appearances for appellants.

Michael Rubin, with whom Wayne H. Matelski, Lynda Zengerle, Deborah Sanders, and Carolyn Waller, Washington, D.C., were on the brief, for appellees in 88–5226 and 90–5293. David Aronofsky, Washington, D.C., also entered an appearance for appellees.

David M. Billings, Washington, D.C., for appellants in 89–5301. Wayne H. Matelski,

Washington, D.C., also entered an appearance for appellants.

Before WALD, SILBERMAN and D.H. GINSBURG, Circuit Judges.

Opinion for the Court filed by Circuit Judge SILBERMAN.

Dissenting opinion filed by Circuit Judge WALD.

SILBERMAN, Circuit Judge:

These three consolidated cases all involve questions regarding the jurisdiction of the district court to hear claims brought by Ayuda, Inc. (along with three other organizations that advise aliens and five unnamed aliens) to prevent the Immigration and Naturalization Service (INS) from administering the Immigration Reform and Control Act (IRCA)[1] in a fashion alleged to be contrary to the statute and the Constitution. The first case (*Ayuda I,* No. 88–5226) is here on remand from the Supreme Court, which asked us to reconsider our opinion in *Ayuda, Inc. v. Thornburgh,* 880 F.2d 1325 (D.C.Cir.1989), *vacated and remanded,* —— U.S. ——, 111 S.Ct. 1068, 112 L.Ed.2d 1174 (1991), holding that the district court lacked jurisdiction, in light of the Court's subsequent decision in *McNary v. Haitian Refugee Center, Inc.,* —— U.S. ——, 111 S.Ct. 888, 112 L.Ed.2d 1005 (1991). The second case (*Ayuda II,* No. 90–5293) involves interim relief granted by the district court in the same proceeding in which we had held the court lacked jurisdiction. The government, not surprisingly, challenges the district court's jurisdiction to issue the interim order. Finally, in *Ayuda III* (No. 89–5301) the plaintiffs[2] appeal the district court's denial of their request that the government be held in contempt for allegedly violating a prior district court order in this protracted proceeding. We hold, in line with our original position, that the district court lacked subject matter jurisdiction to issue the orders sought in *Ayuda I* and *Ayuda II*

and that the appeal in *Ayuda III* is therefore moot.

### Ayuda I

#### A.

The background to congressional passage of IRCA is set forth in our prior opinion, *see Ayuda,* 880 F.2d at 1326–27, and in *McNary,* 111 S.Ct. at 890–91. Suffice it to say that IRCA was a congressional compromise whereby new techniques for stopping the flow of illegal aliens into the United States were balanced with amnesty programs for undocumented aliens who met certain requirements.

The amnesty program at issue in this case, *see* 8 U.S.C. § 1255a, gave aliens the opportunity to apply for legalization during a one-year period ending on May 4, 1988. *See id.* § 1255a(a)(1)(A). If "nonimmigrants" (aliens who entered the country legally but later lost that lawful status) could show, *inter alia,* that they were in this country unlawfully since January 1, 1982, and that their unlawful status was "known to the Government," *id.* § 1255a(a)(2)(A) & (B), they were entitled to legalization. The INS promulgated a regulation stating that "known to the Government" meant "known to the INS." Approximately seven weeks before the May 4, 1988, deadline, plaintiffs filed suit in district court, claiming that "known to the Government" was broader in its reach and meant "known to any agency of the Government." The district court held that the INS regulation was contrary to the statute and issued a series of four orders adopting and implementing plaintiffs' interpretation. *See Ayuda, Inc. v. Meese,* 687 F.Supp. 650, 666–68 (D.D.C.1988). The government did not appeal, and therefore acquiesced in the substance of these rulings.

Then, less than one week before the end of the amnesty period, the district court issued a fifth order (Supplemental Order V), this time construing the word "known"

1. Immigration Reform and Control Act of 1986, Pub.L. No. 99–603, 100 Stat. 3359.

2. As none of the parties is appellant or appellee in all three consolidated cases, we will refer to the undocumented aliens and the organizations supporting them as the "plaintiffs."

rather than the word "Government." One class of aliens (section 265 claimants) were under pre-IRCA law [3] permitted to reside in the United States so long as they periodically filed certain forms with the INS; plaintiffs sought a ruling from the district court that if an alien failed to submit these forms, knowledge of the alien's unlawful status could be imputed to the government. Even though the INS had never promulgated an official position on whether knowledge could be inferred from the absence as opposed to the presence of information concerning an alien, and even though the INS' Legalization Appeals Unit (LAU) had never denied an alien's legalization application on the ground that the absence of forms was insufficient to establish knowledge, the district court granted plaintiffs' request. *See id.* at 668. The government appealed this order on jurisdictional grounds.

The government, "in effect challenging the district court's jurisdiction over the entire case," *Ayuda*, 880 F.2d at 1329, argued that IRCA's provisions respecting administrative and judicial review first require exhaustion of administrative remedies and then vest exclusive jurisdiction in the courts of appeals to review INS legalization decisions. Those provisions specify that "[t]here shall be no administrative or judicial review of a determination respecting an application ... [for legalization] except in accordance with this subsection." 8 U.S.C. § 1255a(f)(1). They further direct the Attorney General to "establish an appellate authority to provide for a single level of administrative appellate review of [such] a determination," *id.* § 1255a(f)(3)(A), and state that "[t]here shall be judicial review of such a denial only in the judicial review of an order of deportation under section 1105a of this title [which provides for exclusive court of appeals jurisdiction]," *id.* § 1255a(f)(4)(A).

Plaintiffs argued that the district court had *general* federal question jurisdiction, *see* 28 U.S.C. § 1331 (as well as jurisdiction under the immigration laws, *see* 8 U.S.C.

§ 1329, and the Fifth Amendment), to provide direct review of the legality of the INS regulation—of which the "known" issue was a by-product—because the statutory sections providing exclusive court of appeals review covered only "*a* determination respecting *an* application," 8 U.S.C. § 1255a(f)(1) (emphasis added), and therefore did not apply to "broad challenges to an INS policy or legal position that could apply to many [determinations]." *Ayuda*, 880 F.2d at 1330. A regulation construing the statute and agency interpretations of the regulation comprised, plaintiffs contended, just such a policy or legal position.

We rejected plaintiffs' argument, reasoning, *inter alia*, that the legality of the regulation could certainly be challenged by an individual alien on appeal from a deportation order and that the regulation was therefore a determination respecting an application. We thought we would otherwise create an anomalous situation in which a single claimant challenging his deportation order on grounds that the regulation was inconsistent with the statute and that his legalization application was therefore improperly denied would be obliged to bring his appeal to the court of appeals, while some combination of potential claimants could sue directly in district court, avoiding the statutory administrative procedures and the court of appeals. *See id.* We relied in part on *Heckler v. Ringer*, 466 U.S. 602, 104 S.Ct. 2013, 80 L.Ed.2d 622 (1984), in which the Supreme Court held that plaintiffs who sought to establish a right to reimbursement for a type of operation under the Medicare Act by bringing an action in district court were obliged to pursue their administrative remedies first. The Court there defined the word "claim" under the Act to include one plaintiff's preemptive challenge to an agency policy that allegedly would prevent him from ever getting the operation that would constitute the basis for his claim to reimbursement. *See Ayuda*, 880 F.2d at 1332 (citing *Ringer*, 466 U.S. at 621, 104 S.Ct. at 2024–25).

---

**3.** *See* Immigration and Nationality Act (INA) § 265, 8 U.S.C. § 1305 (1976), *amended by* 8 U.S.C. § 1305 (1982); *see also* 8 C.F.R. § 265.1 (1981).

We found it unnecessary to decide a second jurisdictional objection raised by the government—the organizational plaintiffs' standing. The district court seemed to have determined that the individual plaintiffs, singularly or in groups, could not sue in district court to raise a legal question that could be resolved in the courts of appeals, but that organizations such as Ayuda—"qualified designated entities" (QDEs) recognized under the statute as having a counseling role for illegal aliens—could sue because they were, of course, not subject to deportation and therefore had no right to judicial review in the courts of appeals. *See id.* at 1339 & n. 15. We did not decide the standing issue because we concluded that, as in *Block v. Community Nutrition Institute,* 467 U.S. 340, 104 S.Ct. 2450, 81 L.Ed.2d 270 (1984), the statutory review provisions revealed a congressional purpose to preclude judicial review of issues that could be raised in an appeal from a deportation order on the part of an organization that was, in effect, acting as a representative of individual aliens even though it was asserting an "organizational injury." *See Ayuda,* 880 F.2d at 1339–40.

We then held alternatively that the district court also lacked jurisdiction to issue its order concerning the INS' "policy" regarding section 265 claimants because that policy was neither final nor ripe. Only "final agency action" is reviewable, 5 U.S.C. § 704, but all the alleged "policy" amounted to was that "at most, *some* local INS offices were informing aliens that the office would *recommend* denial of applications based on the section 265 theory." *Ayuda,* 880 F.2d at 1342 (emphasis in original). Because "all recommended denials [would be] referred to an adjudicator, whose decision [would be] subsequently reviewable by the Legalization Appeals Unit," which had never actually decided a case involving the issue, it was clear that "such a recommendation, let alone a prior indication that such a recommendation would be made, does not constitute *final* agency action." *Id.* (emphasis in original).

The lack of a clear INS position also contributed heavily to our decision that the section 265 issue was unripe for review. *See id.* at 1343–46. The word "known" is ambiguous, and it "follows naturally from *Chevron* [*U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842–43, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984),]" that "when dealing with an ambiguous statutory term ..., a court should not impose its own interpretation of the term *before* the agency has an opportunity to consider the issue and fix its own statutory construction." *Ayuda,* 880 F.2d at 1343–44 (emphasis in original). We concluded that the "compelling reasons for postponing judicial intervention" clearly outweighed "the alleged hardship to [the plaintiffs] if deprived of a rapid clarification of 'known to the Government,'" especially because the hardship alleged confused the plaintiff QDEs' organizational interests with the interests of non-party aliens and, in any event, glossed over the fact that aliens inevitably faced the risk of coming forward to challenge a denial of legalization, without any guarantees of success. *Id.* at 1345–46.

Subsequently, the Supreme Court decided *McNary* and we are now to consider whether, and to what extent, *McNary* obliges us to reexamine our opinion.

### B.

*McNary,* dealing with IRCA's Special Agricultural Workers (SAW) amnesty program, required the Court to interpret a parallel administrative and judicial review section of IRCA, 8 U.S.C. § 1160(e), and to mark the reach of the phrase "a determination respecting an application," *id.* § 1160(e)(1). The Supreme Court held that that wording did not refer to "general collateral challenges to unconstitutional practices and policies used by the agency in processing applications," 111 S.Ct. at 896, and therefore did not preclude an action brought in district court to redress such practices.

The plaintiffs in *McNary* claimed, and for purposes of Supreme Court review it was undisputed, that the INS was engaging in "a pattern or practice of procedural due process violations ... in its administra-

tion of the SAW [amnesty] program." *Id.* 111 S.Ct. at 892. It was alleged, for example, that applicants were not afforded an opportunity to challenge material adverse evidence or to present witnesses, that competent interpreters were not provided, and that there were no recordings of applicant interviews. *See id.* at 894. Crucial to the Court's reading of section 1160(e)(1) was its focus on a companion provision that provides that "judicial review shall be based *solely* upon the administrative record established at the time of the review by the appellate authority [within the INS]." 8 U.S.C. § 1160(e)(3)(B) (emphasis added). The Court concluded that the record created during the SAW administrative review process would be inadequate for any meaningful appellate review of the serious procedural constitutional questions raised. *See McNary,* 111 S.Ct. at 896 ("[T]he administrative appeals process does not address the kind of procedural and constitutional claims respondents bring in this action...."). The Court noted that the courts of appeals lack the fact-finding and record-developing capacities necessary to correct this deficit. Therefore, Congress would not have intended that those sort of claims be subject to administrative exhaustion and limited to court of appeals review. *See id.* at 896–97, 898–99.[4]

The Court distinguished *Ringer* on two grounds. The first was that in *Ringer* the claim raised in district court was not collateral to the plaintiffs' substantive entitlement to reimbursement for the operations; whereas, in *McNary* the Court observed that even if the plaintiffs prevailed, they would only be entitled to have their "applications reconsidered in light of the newly prescribed INS procedures." *Id.* at 898. Second, in *Ringer,* the Court believed that

the plaintiffs, if they exhausted their administrative procedures, would get adequate judicial review; whereas, in *McNary,* as the Court pointed out:

> [T]he District Court found, because of the lack of recordings or transcripts of LO [Legalization Office] interviews and the inadequate opportunity for SAW applicants to call witnesses or present other evidence on their behalf, the administrative appeals unit of the INS, in reviewing the decisions of LOs and regional processing facilities, and the courts of appeals, in reviewing SAW denials in the context of deportation proceedings, *have no complete or meaningful basis upon which to review application determinations.*

*Id.* at 898 (emphasis added).

*McNary,* like *Ayuda,* did not decide whether QDE organizational plaintiffs have standing. In fact, the Supreme Court did not consider at all whether those organizations have any independent litigation role under IRCA. *See McNary,* 111 S.Ct. at 891–92, 894 & n. 8. Instead, the Court appears to have assumed that it was unnecessary to consider those issues because there were individual aliens as plaintiffs in the action and, presumably, the organizational plaintiffs would have no *greater* right (if, indeed, they had *any* right) to sue than did the individual plaintiffs.

### C.

In reargument plaintiffs assert that *McNary* obliges us to alter our original opinion and now determine that the district court properly exercised jurisdiction over the case. They believe that *McNary* has confined the special judicial review provi-

---

**4.** The Court also believed that a "collateral challenges" exception to the statutory review limitations was indicated by the "abuse of discretion" standard of judicial review under section 1160(e)(3)(B), which, although "appropriate for judicial review of an administrative adjudication of the facts of an individual application ...[,] does not apply to constitutional or statutory claims, which are reviewed *de novo* by the courts." *McNary,* 111 S.Ct. at 897. We have, however, commonly understood "abuse of discretion" standards to allow unrestricted appel-

late review for *legal* error, see, e.g., *Pappas v. FCC,* 807 F.2d 1019, 1023 (D.C.Cir.1986); *Jaimez-Revolla v. Bell,* 598 F.2d 243, 246 (D.C.Cir. 1979); we do not think the Court meant to disagree with that proposition. And in any case, the Court's concern does not appear to be implicated by the claims presented here, since such statutory interpretation questions are clearly governed by the standard of review set forth in *Chevron,* 467 U.S. at 842–43, 104 S.Ct. at 2781–82.

sions of IRCA to the case of an *individual* challenging a deportation order on the ground that his legalization application was improperly denied. The government, on the other hand, reads *McNary* as creating an exception to the statutory review provisions limited strictly to collateral *procedural* challenges to the legalization process, regardless of the number of plaintiffs.

■ Although it is certainly true that the Supreme Court's reading of the words "a determination respecting an application" is narrower than was ours in our original opinion,[5] we believe that the Court's reasoning—and particularly its distinction of *Ringer*—leaves our case on the *Ringer* side of the analytical divide. In the first place, this lawsuit is an indirect but nevertheless obvious effort to adjudicate the plaintiff aliens' ultimate eligibility for legalization. We do not encounter a collateral challenge, the resolution of which does not necessarily confer eligibility.

In this regard, we are not sure that the government is correct in focusing on the Supreme Court's repeated use of the word "procedure" as setting forth a strict procedural/substantive dichotomy; we think the Court was instead drawing a distinction between collateral issues (which might normally be procedural) and those that go to the heart of an applicant's claim. As in *Ringer*, plaintiffs here seek "the invalidation of the current [agency] policy" as contrary to statute and a "declaration" of what they believe is the proper statutory interpretation. *Ringer*, 466 U.S. at 614, 104 S.Ct. at 2021. The individual aliens whose interests are at stake, we are told, are persons whose presence in the United States was "known to the Government" and who are able to satisfy the other statutory requirements for legalization. Thus,

if plaintiffs' interpretation of that statutory phrase were to be accepted, the decision would "have the effect of establishing their entitlement" to legalization. *McNary*, 111 S.Ct. at 898. To permit plaintiffs to bring in federal district court an action designed to resolve the core issue of law that they will encounter in a legalization proceeding, and perhaps in an appeal from a deportation order, " 'would allow claimants substantially to undercut Congress' carefully crafted scheme for administering the [IRCA].' " *McNary*, 111 S.Ct. at 898 n. 13 (quoting *Ringer*, 466 U.S. at 621, 104 S.Ct. at 2025). That is why in *Ringer* the Court thought it mattered not whether a plaintiff had actually made a claim or was suing in anticipation of filing a claim; in either event, the action was construed as a "claim arising under" the Medicare Act because to hold otherwise would be to allow mere form to defeat congressional purpose. *Ringer*, 466 U.S. at 621, 104 S.Ct. at 2024–25.

■ Second, plaintiffs have not shown why they cannot be assured complete and adequate review in the courts of appeals, after exhaustion of administrative procedures, of the issue—the definition of "known to the Government"—that they would have the district court decide. We are not faced here with the problem of an inadequate record for appellate review, which troubled the Supreme Court in *McNary* and led it to conclude that Congress could not have intended to limit judicial review of the procedural challenges involved there. The question in this case is whether an agency's alleged interpretation of a statute is contrary to law, a question courts of appeals quite frequently decide on direct review of agency action. No one contends that a court of appeals would

**5.** The Court seemed to read the "determination respecting an application" language as barring direct district court review only of "a *single* [INS] act" or "*individual* denials of SAW status" and not of "a *group* of [INS] decisions" or "*general* collateral challenges." *McNary*, 111 S.Ct. at 896 (emphases added). But if this were the case, two aliens (two being a "group") or any class of aliens with similar claims could freely choose between filing declaratory judgment actions in district court and filing individual legal-

ization applications with the INS—or, presumably, both. This reading would transform what the Court agreed were provisions "limit[ing] review," *id.* at 898, into provisions bestowing upon aliens a choice of forum. Seen against the remainder of the Court's analysis, and in light of *Ringer's* directive that review provisions "must be construed" to prevent forum-shopping, 466 U.S. at 621, 104 S.Ct. at 2024–25, we do not think this individual/group distinction is controlling. *See infra* at 752–753.

have any difficulty deciding whether *any* INS interpretation of IRCA as it related to section 265 claimants was good law or not. And it cannot be seriously suggested that a court of appeals would be hampered by considering such a legal question in specific factual contexts—that is, as applied to particular aliens. In short, if the administrative and judicial review procedure that Congress provided is adequate to provide full relief of individual aliens' legal claim—and we believe that it is, *see Ayuda*, 880 F.2d at 1339 & n. 15—there is no reason to permit plaintiffs to circumvent the statutory procedure.

■ This is not, as should be apparent, a garden variety exhaustion of administrative remedies case, in which a reviewing court can dispense with ("waive") exhaustion if the court determines that resort to the agency procedures would be inadequate or futile. *See Randolph–Sheppard Vendors of Am. v. Weinberger*, 795 F.2d 90, 105–07 (D.C.Cir.1986). Congress here expressly provided that an alien could challenge the government's refusal to grant legalization under the statute only if the government sought to deport the alien and then only in the courts of appeals. *See Weinberger v. Salfi*, 422 U.S. 749, 766, 95 S.Ct. 2457, 2467, 45 L.Ed.2d 522 (1975) (holding that "a statutorily specified jurisdictional prerequisite" is "something more than simply a codification of the judicially developed doctrine of exhaustion, and may not be dispensed with merely by a judicial conclusion of futility"). The Supreme Court thought that Congress did not intend that procedure to preclude district court authority to remedy INS practices that could *not* adequately be reviewed in the courts of appeals on appeal of a deportation order. Insofar as the Supreme Court examined the adequacy of the INS' administrative procedures in *McNary*, it was only to determine whether an adequate record would be compiled to provide a court of appeals with the wherewithal for meaningful review. Neither the Court nor Congress has granted us an open-ended commission to judge for ourselves the "adequacy" of the administrative procedures, short of judicial review, that are available to rem-

edy an alleged INS misunderstanding of IRCA.

■ Nor is there, notwithstanding the implications in the dissenting opinion, any general right stemming from either administrative or constitutional law to challenge agency regulations or, as in this case, interpretations of regulations facially rather than on an as-applied, case-by-case basis.

The case-by-case approach that this [principle that only individual agency actions and not entire "programs" can be challenged requires] is understandably frustrating.... But this is the traditional, and remains the normal, mode of operation of the courts. Except where Congress explicitly provides for our correction of the administrative process at a higher level of generality, we intervene in the administration of the laws only when, and to the extent that, a specific "final agency action" has an actual or immediately threatened effect [citation omitted]. Such an intervention may ultimately have the effect of requiring a regulation ... to be revised in order to avoid the unlawful result that the court discerns. But it is assuredly not a swift or as immediately far-reaching a corrective process as those interested in systemic improvement would desire. Until confided to us, however, more sweeping actions are for the other Branches.

*Lujan v. National Wildlife Fed'n*, —— U.S. ——, 110 S.Ct. 3177, 3191, 111 L.Ed.2d 695 (1990). Of course, if an alien prevailed in the court of appeals challenging the INS' interpretation of section 265 as a "rule of broad applicability," the result could well be "that the rule is invalidated, not simply that the court forbids its application to a particular individual." *Id.* 110 S.Ct. at 3201 (Blackmun, J., dissenting).

■ As far as we can tell, neither the plaintiffs nor the dissent fix upon any real inadequacy that has developed or could be expected to develop in the administrative record of any of the plaintiffs *for purposes of judicial review.* Apparently, none of the individual plaintiffs has gone through the legalization process and none is subject

to a deportation order. To be sure, the plaintiffs suggest that some aliens were denied an opportunity even to file their applications for legalization. Were that the case, we would agree that *McNary* would apply and the district court would have had jurisdiction to order the INS' local offices to accept applications. (Indeed, the government's initial brief conceded as much.) Otherwise, an alien in that position would not have been able to develop any sort of administrative record on which, if the government initiated deportation proceedings and obtained a deportation order, the alien could rely in the court of appeals. But that is not this case; there was no evidence presented that any aliens (much less any of the five individual alien plaintiffs) were prevented from filing an application. *See Ayuda*, 880 F.2d at 1341–42. Some local INS offices may well have told some section 265 claimants that if they applied (which required a hefty $185 fee) the office would recommend that legalization be denied. To the extent that occurred, some aliens may have been discouraged or deterred from filing, just as they would have been discouraged if a QDE (or, for that matter, a lawyer) gave the same advice, but that hardly suffices to give the district court jurisdiction to preempt the INS and issue its own declaratory judgment on the legal issue. The distinction between giving advice on a difficult legal question—advice that may or may not turn out to be wrong—and literally closing the INS' office doors in aliens' faces—foreclosing judicial review under the statutory scheme—is, under *McNary*, decisive whether or not "subtle." Dissent at 761 n. 3.

◼ The dissent also argues—although plaintiffs never did—that the INS' prosecutorial discretion to decide when, against whom, and in which circuit it should bring deportation proceedings that would raise statutory interpretation questions gives the INS inappropriate power to control judicial review. But that kind of authority is inherent in prosecutorial discretion, and it is surely late in the day for it to be challenged by a circuit judge. *See Heckler v. Chaney*, 470 U.S. 821, 831, 105 S.Ct. 1649, 1655, 84 L.Ed.2d 714 (1985) ("This Court has recognized on several occasions over many years that an agency's decision not to prosecute or enforce ... is a decision generally committed to an agency's absolute discretion."). Our colleague goes on to suggest in a footnote, *see* Dissent at 767–768 n. 8, that the government might actually refuse to deport aliens who were denied legalization on disputable legal grounds—even someone who requested deportation in order to obtain judicial review—just to frustrate judicial review. Of course, we have not seen a shred of evidence that the INS has ever considered such a despicable course, but even if it were to occur, we think that the *McNary* exception would again apply. Aliens faced with that effort to circumvent the plain congressional scheme by denying them any meaningful judicial review could certainly rely on *McNary* to sue directly in district court.[6]

---

6. The dissent cites two recent Ninth Circuit cases, *Campos v. Nail*, 940 F.2d 495 (9th Cir. 1991), and *El Rescate Legal Servs., Inc. v. Executive Office of Immigration Review*, 941 F.2d 950 (9th Cir.1991), as support for district court jurisdiction over this case. *See* Dissent at 766–767 & n. 7. Each of those cases, however, involved not IRCA but rather section 106 of the INA, 8 U.S.C. § 1105a. *See Campos*, 940 F.2d at 497; *El Rescate*, 941 F.2d at 953. As we discussed in our prior opinion, the question "whether there is a 'program' exception to section 106[ ] for constitutional and statutory claims" raised before the initiation of deportation proceedings remains open in this circuit. *Ayuda*, 880 F.2d at 1335–37. We noted, however, that although the judicial review provision of IRCA incorporates the machinery of section 106, it also *expressly* provides that an alien may seek judicial review of a denial of legalization *only* in the context of a section 106 proceeding. *See* 8 U.S.C. § 1255a(f)(4)(a). Whatever the reach of the *McNary* exception regarding IRCA cases, then, it might well be broader with respect to non-IRCA immigration cases. *See Ayuda*, 880 F.2d at 1337–38. Indeed, the *El Rescate* court did not even cite *McNary*.

In any event, we think that the results—if not the reasoning—of *Campos* and *El Rescate* are consistent with our reading of *McNary*. *Campos* involved an Immigration Judge (IJ) who continued, despite two reversals by the court of appeals, to employ a blanket practice of denying venue changes to aliens faced with deportation proceedings. The Ninth Circuit determined that it could not effectively control the "rogue" IJ through judicial review of individual deporta-

■ The only real argument that plaintiffs make to the effect that the statute's *judicial* review procedure is *inadequate* (besides that it is *burdensome*) is that aliens would have to come forward, lose anonymity, and risk deportation in order to obtain judicial review of an INS statutory interpretation that governed legalization determinations. It is important to recognize in this regard that under the statutory scheme, aliens run no risk when applying for legalization because the INS may not use any information gained through the application or the administrative review of the application to initiate or prosecute a deportation proceeding against the alien. *See* 8 U.S.C. § 1255a(c)(5). Still, a denial of legalization surely causes some injury and the only way under the statute that an alien can challenge the denial is to provoke a deportation proceeding. The Supreme Court did say that "that price is tantamount to a complete denial of judicial review for most undocumented aliens," *McNary*, 111 S.Ct. at 898, but we do not see how that observation could be extended to the holding in the case. If it were, even an individual alien could sue in federal district court at any point prior to a deportation order to challenge any action of the INS that bore on his legalization and to obtain a judicial opinion that would make the INS' decision on his actual application a mere formality. That would make a hash of the legislative scheme, which envisioned an alien not only coming forward (and losing anonymity) but also becoming the subject of an actual deportation order as prerequisites to judicial review. *See id.* at 893.[7] Judge Wald contends, however, that aliens should have the right to bring "test cases" in federal district court so that they

could know whether their applications would ultimately lead to legalization before the statutory period for filing applications expired. *See* Dissent at 765. The short and complete answer to this contention, in our view, is that Judge Wald's desired statute is not the one Congress enacted.

It certainly can be argued as a matter of policy that Congress should not have put aliens whose applications are denied to the difficult choice of either courting deportation or not seeking judicial review. *See generally* Kanstroom, *Judicial Review of Amnesty Denials: Must Aliens Bet Their Lives to Get Into Court?*, 25 HARV. C.R.C.L.L.REV. 53 (1990).[8] But Congress did, and "[i]t is not our task to make an imperfect statute perfect." *Central Vermont Ry. v. Brotherhood of Maintenance of Way Employees*, 793 F.2d 1298, 1303 (D.C.Cir.1986). In *Ringer*, it was also argued that the statutory exhaustion requirement (jurisdictional, not waivable) could deprive a claimant of meaningful administrative and judicial review because he might not be able to afford an operation for which a reimbursement claim would be made—and his doctor might not be willing to assume the risk of nonpayment by the government. That concern, expressed in the dissenting opinion, led the Court's majority to respond that "Congress ... surely could have provided a scheme whereby claimants could obtain declaratory judgments about their entitlements to benefits...." *Ringer*, 466 U.S. at 625, 104 S.Ct. at 2027. Similarly, here Congress could have provided for a declaratory judgment procedure to ascertain an alien's entitlement to legalization, or at least for direct review of a denial of legalization.

---

tion orders, so it upheld the district court's jurisdiction to enjoin the IJ's misbehavior and to require him to consider the individual merits of the aliens' requests. *El Rescate* involved an INS practice of providing incompetent and incomplete interpretation to aliens during immigration court hearings—one of the very practices at issue in *McNary*.

7. It is also not apparent why even a preemptive suit would necessarily preserve an alien plaintiff's anonymity. *See generally* 2A J. MOORE, J. LUCUS & G. GROTHEER, JR., MOORE'S FEDERAL PRACTICE ¶ 10.02, at 10–6 to 10–8 (1991) (discussing the

general presumption against the use of fictitious names for plaintiffs except where a "threat of actual physical harm" or a "strong privacy interest" is at stake); *Hotel & Restaurant Employees Union, Local 25 v. Smith*, 846 F.2d 1499, 1518 (D.C.Cir.1988) (opinion of Silberman, J.) (noting problems in analyzing standing and ripeness when plaintiffs are not identified).

8. The plaintiffs do not argue that the statutory judicial review scheme itself violates their constitutional rights.

But Congress did not, and we do not read *McNary* to say otherwise.

■ Essentially, the analytical difficulty with plaintiffs' position and, with all due respect, the flaw in our dissenting colleague's reasoning, lie in an inability to describe those situations *not* covered by the *McNary* exception to IRCA's judicial review procedures. The dissent, for instance, tells us that anyone—even an individual alien—may seek a declaratory judgment or injunction interfering with the INS' administration of IRCA simply by framing the challenge as "directed at a general policy and not an individualized determination," Dissent at 763 n. 4—something any competent lawyer could surely do. As such, the dissent runs afoul of the same problem the dissenters in *Ringer* encountered, that the exception would inevitably swallow the rule. *See Ringer*, 466 U.S. at 625–26, 104 S.Ct. at 2027–28; *see also supra* note 5. We therefore do not think Judge Wald's approach is a fair interpretation of the Supreme Court's opinion in *McNary;* the Court thought that Congress created an implied exception to the restrictive judicial review of legalization denials—on review of deportation orders in the courts of appeals—only for those cases in which, for structural reasons, court of appeals review would be inadequate.

If *McNary* were not read as focused on the structural inadequacy of court of appeals review of the collateral constitutional claims presented in that case, we would create a hopeless jumble of confusion as to which IRCA cases come to the district court and which to the courts of appeals. The dissent does not, and in our view could not, contend that should a case come to us or any other court of appeals on an appeal from a deportation order raising the section 265 claim, we would have any difficulty in examining the INS' interpretation of the

statute—in other words, reviewing the case. Judge Wald's reading of *McNary*, accordingly, runs squarely against (without any explanation) an important principle governing judicial review of agency action: the same question may not be brought into either the court of appeals or the district court at the litigant's pleasure. *See Ayuda*, 880 F.2d at 1333; *Telecommunications Research & Action Center v. FCC*, 750 F.2d 70, 77–79 (D.C.Cir.1984) (*TRAC*).

In sum, we believe *McNary* holds that if the statutory administrative and judicial review scheme provides meaningful court of appeals review of an alien's legal claim, then Congress intended that scheme to be exclusive—ousting the district court of jurisdiction to hear the sort of claim at issue here. It is only when a collateral issue, typically a procedural practice, cannot be adequately presented to the courts of appeals that the exclusivity of section 1255a(f)(1) gives way. We do not dispute the "well-settled presumption favoring interpretations of statutes that allow judicial review of administrative action." *McNary*, 111 S.Ct. at 898. Plaintiffs' claims *will* receive full judicial review—but only after exhaustion of the administrative process that Congress provided and only in the court that Congress provided.[9]

In the best of all worlds, immediate judicial access for all of these parties might be desirable. But Congress, in [the statute], struck a different balance, refusing declaratory relief and requiring that administrative remedies be exhausted before judicial review of the Secretary's decisions takes place. Congress must have felt that cases of individual hardship resulting from delays in the administrative process had to be balanced against the potential for overly casual or premature judicial intervention in an administrative system that processes literally millions of claims every year. [foot-

---

**9.** The dissent's invocation of *Bowen v. Michigan Academy of Family Practitioners*, 476 U.S. 667, 106 S.Ct. 2133, 90 L.Ed.2d 623 (1986), misses the mark. As we noted in our original opinion, *see Ayuda*, 880 F.2d at 1336–37 n. 11, *Michigan Academy* dealt with whether Congress had intended to preclude *all* judicial review of certain Medicare claims, not, as here, with whether the

courts must respect the scheme of judicial review that Congress specifically provided. Our prior opinion also explained why *International Union, UAW v. Brock*, 477 U.S. 274, 106 S.Ct. 2523, 91 L.Ed.2d 228 (1986), relied on by plaintiffs then and by the dissent now, *see* Dissent at 768–69, is inapposite. *See Ayuda*, 880 F.2d at 1338.

note omitted]. If the balance is to be struck anew, the decision must come from Congress and not from this Court. *Ringer*, 466 U.S. at 627, 104 S.Ct. at 2028.

## D.

Our original opinion in this case rested on alternative holdings, both jurisdictional in character. We concluded that the INS "policy" that plaintiffs sought to attack had not been adopted or applied by the agency in a definitive enough fashion, if at all, to permit judicial review—even assuming the district court had jurisdiction to hear the claim. *Ayuda*, 880 F.2d at 1341–46. We see nothing in *McNary* that impacts at all on our finality and ripeness alternative holding.

■ To be sure, subsection 1255a(f), on which our jurisdiction discussion centers, is a statutory provision that does two things. It requires exhaustion of administrative procedures before going to any court, and it limits review of administrative determinations that are or could be decided in that process to the courts of appeals. Exhaustion, as a doctrine of administrative law, overlaps with ripeness and finality. *See generally Ticor Title Ins. Co. v. FTC*, 814 F.2d 731 (D.C.Cir.1987). All three are designed, in part, to permit an agency of the Executive Branch to decide issues of administrative law fully before a court intervenes. Insofar as *McNary* concluded that section 1160(e) did not bar collateral challenges to unconstitutional procedures adopted by the INS in processing applications, it determined that Congress did not intend that section to require *exhaustion* of administrative procedures with regard to those claims. But that, as we have discussed, was because those issues could not be adequately addressed in the courts of appeals since the record compiled in the administrative process was inadequate. Under those circumstances, the Court did not believe that Congress intended that those sorts of issues had to be fully litigated through an administrative process that was not really equipped to deal with a constitutional challenge to the agency's practices and procedures. The issues litigated in *McNary* were also clearly *final* and *ripe* for judicial review as collateral challenges to the agency's undisputed systemic practices. *See McNary*, 111 S.Ct. at 895. The *McNary* plaintiffs' claims did not ask the district court to preempt the INS' efforts to interpret IRCA's ambiguous provisions; the *Ayuda* plaintiffs' claims do.

■ In our original opinion we discussed at length why we thought the section 265 issue presented to the district court was not final or ripe (our ripeness discussion included, of course, a hardship analysis). After examining *McNary*, we stand by our views on that question. *See Ayuda*, 880 F.2d at 1341–46. Judge Wald, however, abandons her original position, *see Ayuda*, 880 F.2d at 1362–64 (Wald, C.J., dissenting) ("[T]he INS had a formal, final policy on § 265 violators...."), and now agrees that the INS had "not yet articulated the agency's policy with regard to § 265 IRCA applicants"—had not yet acted—but contends nevertheless that the case was "ripe" for judicial "review" because of the severe hardship that the plaintiff aliens would otherwise suffer. Dissent at 769–770. We simply do not understand how the district court could be thought to have authority to "review" actions or positions not yet taken by an agency. To be sure, under the Administrative Procedure Act (APA), judicial review is available to determine whether agency action has been "unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1). *See Public Citizen Health Research Group v. Commissioner, FDA*, 740 F.2d 21, 32 (D.C.Cir. 1984). But the plaintiffs have never claimed that the INS was dilatory or in any way unreasonably delayed action. On the contrary, the agency seems to have been moving with alacrity to process applicants during the statutory window period. Moreover, as we noted in our previous opinion, the INS was not obliged, nor could it reasonably have been expected, to announce in advance of the receipt of applications its position on all the many, perhaps infinite, variations of legal issues that could arise in the interpretation of IRCA. *See Ayuda*, 880 F.2d at 1332–33. Indeed, as we also

noted, Congress did not direct the agency to issue any regulations (with one exception not relevant here) that would set forth the agency's interpretations of the statute, so it can be assumed that Congress expected those interpretations would issue in case-by-case legalization determinations. *See id.* The agency, by issuing a regulation when it did not have to do so, attracted this litigation. But that regulation did not, as Judge Wald now agrees, resolve the question raised by the section 265 claimants. *See id.* at 1342–43. We therefore do not see how the cause of action created by the APA, authorizing judicial intervention when an agency unreasonably delays action, has anything to do with this case—much less cures its jurisdictional defects. *See TRAC,* 750 F.2d at 76 ("APA [§ 706(1)] unquestionably does not confer an independent grant of jurisdiction...."). The case was not ripe nor was the agency's action final.

▮ Nor do we understand how the All Writs Act, 28 U.S.C. § 1651(a), could have provided authority to the district court to have issued its extraordinary orders. In the first place, the Act was not relied upon as a basis for relief by either the plaintiffs or the district judge. Even more important, however, it can never provide jurisdiction to a court that does not and would not otherwise have jurisdiction. *See TRAC,* 750 F.2d at 76 ("[I]t is firmly established that section 1651 does not expand the jurisdiction of a court...."); *see also id.* at 77 & n. 33 ("Because the District Court has no present or future jurisdiction over agency actions assigned by statute to appellate court review, it can contemplate no exercise of jurisdiction that mandamus might aid."). This court did, in the *TRAC* case, use the All Writs Act to protect our prospective appellate jurisdiction. But, we did so only to protect our jurisdiction to review final FCC agency action against encroachment by the *district court. See id.* at 76–77. It seems then that the only arguably appropriate use of the Act in this case would have been at the instance of the *government* against the plaintiffs to protect our appellate jurisdiction.

▮ If we understand our dissenting colleague, she contends that the district court could do the reverse—issue an order effectively preventing the court of appeals from gaining jurisdiction over a claim that the district court wished to adjudicate. That would seem to be the effect of the court's order "enjoin[ing the INS] from denying legalization" to section 265 claimants, since it clearly preempts the government from denying legalization, issuing a deportation order, and defending the denial in the court of appeals in accordance with the statutory scheme. We think Judge Wald's argument is premised on a rather peculiar view of the interrelationship of the two courts and is, in any event, a misreading of *TRAC.* We did not, in that case, take jurisdiction of the underlying agency proceeding; we simply prevented the district court from interfering with a case that could eventually come to the court of appeals. Here, the dissent—although not the plaintiffs or the district judge—would have the district court use the All Writs Act in an entirely unprecedented way, allowing the district court to become, in effect, the temporary administrator or overseer of this portion of IRCA. That is not permissible. As we have explained, even if the *McNary* exception applied to this case, the district court still lacked jurisdiction to issue its order directing the INS to act on the section 265 issue because the agency's "policy" on that issue had not crystallized to the point of finality and ripeness. Surely a district court may not use the All Writs Act to exercise jurisdiction over an agency (rather than against an encroaching court) *before* a case is ripe or the agency's action is final. Otherwise, district courts could easily circumvent those jurisdictional bars.

It may well be that some aliens suffered harm by not filing applications for legalization during the one-year grace period. That would be so, of course, only if they were section 265 claimants who were dissuaded from applying because they did not believe they could establish that they had *willfully* failed to file the section 265 quarterly reports or, even if they could, that that would not prove their illegal status was "known" to the government, *see Ayu-*

*da,* 880 F.2d at 1344–45—*and* that it will ultimately turn out that they were wrong. That would certainly be regrettable, even sad, but it is not apparent to us who bears the blame. The Congress provided a risk-free method of filing legalization applications. Any undocumented alien who had a plausible claim to legalization should have at least filed a timely application. Everyone in our society bears the risk of getting bad legal advice. And we all also bear the risk of relying on an incorrect district court judgment.

### Ayuda II

#### A.

There was not much time left before the May 4, 1988, statutory deadline for legalization applications when the district court issued its orders interpreting "known to the Government"; in the case of the section 265 applicants, there were only two days remaining. Just before the grace period was to expire, the plaintiffs moved to toll the deadline for the aliens affected by the court's orders. On May 4, the district court ostensibly denied this request but nevertheless retained jurisdiction to provide "relief" to aliens who missed the deadline because the INS had "dissuaded" them from applying. *Ayuda, Inc. v. Meese,* 687 F.Supp. at 669–70. About a month later, the court ordered the INS to undertake a publicity campaign asking aliens who had not filed before the deadline to send a statement detailing their reasons for not filing and their eligibility for legalization to the plaintiffs' counsel. *See id.* at 671–74.

The government soon moved to vacate this order on the authority of the Supreme Court's intervening decision in *INS v. Pangilinan,* 486 U.S. 875, 108 S.Ct. 2210, 100 L.Ed.2d 882 (1988), which, the government argued, precludes courts from extending or otherwise disregarding a statutory deadline. The district court initially decided

that *Pangilinan* did prevent it from extending the deadline, but then held that decision—as well as its earlier decision to deny plaintiffs' motion to toll the deadline—"in abeyance" and appointed special masters to determine whether any aliens had in fact been dissuaded from applying because of misinformation received from the INS and whether those aliens could otherwise make out a prima facie case of eligibility for legalization. *Ayuda, Inc. v. Meese,* 700 F.Supp. 49, 51–53 (D.D.C.1988). This court denied the government's effort to obtain a writ of mandamus directing the district court to withdraw its appointments, *see In re Thornburgh,* 869 F.2d 1503 (D.C.Cir.1989), but when we then held in *Ayuda* that the district court lacked jurisdiction over the entire matter, the district court stayed most—but not all—of the proceedings involving the special masters.

After filing a petition for certiorari in *Ayuda,* the plaintiffs asked the district court to order the INS to provide interim relief, including work authorizations, to aliens who the *plaintiff organizations* decided had been dissuaded from applying and were eligible for legalization. Notwithstanding that under the law of this circuit he had no jurisdiction to hear any aspect of this case, the district judge granted the requested injunction "pending a final disposition by the United States Supreme Court of *Ayuda, Inc. v. Thornburgh* ... and further Order of this Court." *Ayuda, Inc. v. Thornburgh,* 744 F.Supp. 21, 22 (D.D.C.1990). We granted the government's motion for a stay of that preliminary injunction, *see Ayuda, Inc. v. Thornburgh,* 919 F.2d 153 (D.C.Cir.1990), and now consider the government's appeal.[10]

#### B.

▮▮▮ The propriety of interim injunctive relief turns on four familiar factors: (1) the

---

10. The dissent argues that this appeal is moot because there has been "a final disposition by the United States Supreme Court of *Ayuda*" and because the order's language regarding a "further Order of this Court" is mere "boiler-plate" since "only the issuing court can vacate its own Order." Dissent at 771–772 & n. 15. The Su-

preme Court has indeed disposed of *Ayuda,* but there is no indication whatsoever that the district court had "vacate[d] its own Order." We cannot glibly presume that the interim relief "has come to an end," Dissent at 772; the issue thus remains properly before us.

plaintiffs' likelihood of success on the merits; (2) the threat of irreparable harm to the plaintiffs if interim relief is denied; (3) the threat of substantial harm to others if the relief is granted; and (4) the public interest. *See, e.g., Ambach v. Bell,* 686 F.2d 974, 979 (D.C.Cir.1982) (per curiam). We normally review the district court's balancing of these factors for abuse of discretion. *See, e.g., Foundation on Economic Trends v. Heckler,* 756 F.2d 143, 151 (D.C.Cir.1985). But we do not afford deference when the appeal presents a substantial argument that the trial court's decision was premised upon an erroneous legal conclusion. *See id.* at 152; *Ambach,* 686 F.2d at 979–80; *see also Delaware & H. Ry. v. United Transp. Union,* 450 F.2d 603, 620 (D.C.Cir.), *cert. denied,* 403 U.S. 911, 91 S.Ct. 2209, 29 L.Ed.2d 689 (1971) (such legal premises are "reviewable fully and de novo"). Indeed, this Court has held that "substantial doubt" as to district court jurisdiction provides a basis for suspending a preliminary injunction. *See Southern Ry. v. Brotherhood of Locomotive Firemen,* 384 F.2d 323, 326 (D.C.Cir.1967) (per curiam).

This appeal, of course, does raise serious questions concerning the district court's power to order the INS to grant work authorizations to aliens who did not tender legalization applications before the statutory deadline. We conclude, on two separate grounds, that the district court lacked jurisdiction to issue such an order.

### C.

 Drawing upon the same analysis we developed in the first part of this opinion, we do not think that the district court's exercise of authority in this ancillary proceeding was any more authorized by the *McNary* exception to IRCA's statutory review procedures than it was in *Ayuda I.* We do not view this case as a "collateral" challenge to an INS practice or procedure. Instead, we agree with the government that a "[t]imely application" is one of the four congressionally mandated substantive eligibility "requirements," *see* 8 U.S.C. § 1255a(a)(1)–(4), for entitlement to legali-

zation and work authorization for undocumented nonimmigrant aliens. *See id.* § 1255a(e)(2); *see also Perales v. Thornburgh,* 762 F.Supp. 1036, 1067 (S.D.N.Y.1991). The timeliness of an alien's application, therefore, contributes to the ultimate determination of the merits of his application no less than the other criteria listed in the statute. For aliens whose applications satisfy those other criteria so that they could present an otherwise "prima facie application for adjustment of status," 8 U.S.C. § 1255a(e)(2), success in this action "would have the practical effect of also deciding their claims for benefits on the merits," rather than merely reopening their files for reconsideration in light of new procedural protections. *McNary,* 111 S.Ct. at 897; *see also Ringer,* 466 U.S. at 614, 104 S.Ct. at 2021.

The review process established in section 1255a(f), moreover, appears entirely able to address plaintiffs' challenges (assuming judicial review of plaintiffs' claims is available at all, *see infra* Part II–D). *See Ringer,* 466 U.S. at 617, 104 S.Ct. at 2022–23; *cf. McNary,* 111 S.Ct. at 898. We see no reason why the courts of appeals would encounter any unusual difficulty in considering the propriety of the INS' interpretation of section 1255a to allow or disallow late or "constructive" filings. Nor have plaintiffs argued that the fact-finding capabilities of the district court are essential because the administrative process would not produce a record that would allow meaningful judicial review of their claims. *Cf. McNary,* 111 S.Ct. at 896, 898–99. And the courts of appeals are clearly able to afford plaintiffs whatever relief—legal or equitable—their claims merit.

In short, plaintiffs cannot establish district court jurisdiction simply by presenting their claims as a group and refusing to file the individual applications that would allow the administrative process to operate. Limiting the aliens in this case to the congressionally established review process is appropriate because it would not constitute "the practical equivalent of a total denial of judicial review." *Id.* at 899. And, as we decided before, the statute will not allow the organizational plaintiffs a broader op-

portunity than that of the aliens whom they assist to obtain district court declaratory judgments controlling the INS' treatment of those aliens. *See Ayuda,* 880 F.2d at 1339–40.

### D.

██ Even if the plaintiffs had presented a claim that fell within the *McNary* exception, we would reach the same result because a separate jurisdictional limitation in this section of IRCA unequivocally bars the district court's jurisdiction. In addition to providing the administrative and judicial review structure at issue in *McNary* and *Ayuda I,* section 1255a also directs that "[n]o denial of adjustment of status under this section based on a late filing of an application for such adjustment may be reviewed by a court of the United States or of any State or reviewed in any administrative proceeding of the United States Government." 8 U.S.C. § 1255a(f)(2). This provision, which is not included in the statutory review provisions considered in *McNary*[11] and which emphasizes the congressional intent that the amnesty period come to an end as scheduled, could not in our opinion indicate more plainly that the district court has no power to order the INS to grant work authorizations to aliens who failed to file applications on time. Despite the government's repeated reference to this provision, which speaks directly to the district court's jurisdiction over this case, plaintiffs' brief does not attempt to explain why this language does not constitute a separate bar to this proceeding. That, as the dissent argues, Dissent at 773, there have not yet been actual "denial[s]" due to late filing because the plaintiff aliens preempted administrative action by filing in district court cannot defeat this bar; otherwise, aliens who missed the deadline could circumvent Congress' clear purpose of preventing them from coming to court after losing before the INS on this issue simply by going to court before filing with the agency. *See McNary,* 111 S.Ct. at 898 n. 13; *Ringer,* 466 U.S. at 621, 104 S.Ct. at 2024–25. Therefore, that we cannot know for certain whether the INS will reject these applications is wholly irrelevant.

██ The "well-settled presumption favoring interpretations of statutes that allow judicial review of administrative action," *McNary,* 111 S.Ct. at 898; *see also Bowen v. Michigan Academy of Family Physicians,* 476 U.S. 667, 670–73, 106 S.Ct. 2133, 2135–37, 90 L.Ed.2d 623 (1986), is, of course, just that—a presumption—and it can be overcome by a sufficiently clear congressional directive. *See Bowen,* 476 U.S. at 673, 106 S.Ct. at 2137; *Block v. Community Nutrition Inst.,* 467 U.S. at 349, 351, 104 S.Ct. at 2455, 2456.[12] It is difficult to see how Congress could have made any clearer its intention to prevent judicial intervention into the INS' enforce-

---

**11.** In fact, 8 U.S.C. § 1255a(f)(2) is the *only* part of the review subsection at issue in the *Ayuda* cases, *see id.* § 1255a(f)(1)–(4), that is not duplicated in the review subsection at issue in *McNary, see id.* § 1160(e)(1)–(3).

**12.** To be sure, elimination of judicial review over *constitutional* claims presents a serious constitutional question and the presumption in that context may therefore be more difficult to overcome. *See, e.g., Webster v. Doe,* 486 U.S. 592, 603, 108 S.Ct. 2047, 2053–54, 100 L.Ed.2d 632 (1988); *Johnson v. Robison,* 415 U.S. 361, 373–74, 94 S.Ct. 1160, 1168–69, 39 L.Ed.2d 389 (1974). Plaintiffs make mention of a "due process theory" based on the idea that the government violated the Constitution by affording "many *Ayuda*-eligible aliens ... no meaningful opportunity to apply for legalization" before the statutory deadline. Pl.Br. at 30. This is a conclusion, however, and not an argument—and it also seems merely to restate the statutory issue in constitutional terms. Plaintiffs do not explain why the "opportunity to apply for legalization" is a constitutionally protected entitlement, nor—assuming it is, *but see Lyng v. Payne,* 476 U.S. 926, 942, 106 S.Ct. 2333, 2343, 90 L.Ed.2d 921 (1986) ("We have never held that applicants for benefits, as distinct from those already receiving them, have a legitimate claim of entitlement protected by the Due Process Clause....")—why the plaintiffs did not receive the process constitutionally due under the circumstances. Furthermore, plaintiffs do not even hint that this "due process theory" acts to override Congress' *specific preclusion* of judicial authority to review late filings. Rather, plaintiffs' theory is raised only in the context of "distinguishing *Pangilinan,*" Pl.Br. at 28, a case that involved extension of a statutory deadline rather than evasion of an express statutory bar to judicial review.

ment of the application deadline; we do not see a plausible alternative interpretation of the language Congress used that would allow judicial review in this case. Certainly this provision is far more explicit in its preclusion of review than the statutes at issue in cases such as *Block,* 467 U.S. at 348–52, 104 S.Ct. at 2455–57, or *Morris v. Gressette,* 432 U.S. 491, 501–07, 97 S.Ct. 2411, 53 L.Ed.2d 506 (1977), which made no reference at all to preclusion of review. And we are directed to nothing in the legislative history that would lead us to a different conclusion. Indeed, the legislative history seems to support the plain language. We noted in our original opinion that:

> Congress intended aliens to come forward during the 12–month eligibility period because "this is the first call and the last call, a one shot deal." 132 Cong. Rec. S16,888 (daily ed. Oct. 17, 1986) (remarks of Sen. Simpson). If aliens did not make a legalization claim during that window period, it was lost forever.

*Ayuda,* 880 F.2d at 1333. Furthermore, in late April 1988, with the deadline fast approaching, Congress refused to extend the grace period, despite well-ventilated concerns that last-minute court decisions had confused aliens. *See* 134 Cong.Rec. 9291–96 (1988).[13]

We hold that both 8 U.S.C. § 1255a(f)(1) and (f)(2) deny the district court jurisdiction to order injunctive relief that effectively eliminates the timely application requirement for work authorization. We therefore do not reach the government's remaining arguments.

---

**13.** Plaintiffs cite Senator Grassley's comments during the 1988 debate as support for the idea of judicial power to disregard the deadline:

> There may very well be equitable reasons to allow these individuals to apply [after the deadline]; but there is no doubt that the courts are well equipped to evaluate equitable considerations.

*Id.* at 9295. But no other senator spoke in support of this conception of judicial power, and Senator Simpson, among others, flatly rejected such a view:

> We asked the people to trust us and the trust was "Here it is. It is 1 year." ... "It is a one-time shot and here it is; one time only." That is what we expressed and that is what the people of the United States know....

*Ayuda III*

"A" and "G" nonimmigrant visas are provided to certain foreign diplomats, officials, representatives, and their families and employees; the visas restrict the type of work their holders may perform while in this country. *See* 8 U.S.C. § 1101(a)(15)(A) & (G). Certain "A" and "G" visaholders who had violated the work restrictions applied to the INS for legalization, contending that the unauthorized work made their presence unlawful and that the government knew of their status. The INS denied the applications on the ground that the claimants' status was not unlawful because the State Department had not revoked their visas. Plaintiffs then sought to hold the INS in civil contempt of the district court's orders construing "known to the Government"; the district court denied the motion. Plaintiffs appealed, then asked our court to hold their appeal in abeyance pending further appellate review of our first opinion in *Ayuda;* the government moved to dismiss, arguing first that the district court's ruling was not an appealable final order and then, after the *McNary* decision, that the district court had no jurisdiction over this matter. The issue before us is thus both the district court's jurisdiction to hear plaintiffs' motion and our jurisdiction to hear plaintiffs' appeal, but not the merits of the motion.[14]

In *Ayuda I,* however, we hold that the district court was without jurisdiction to issue the orders of which the INS is allegedly in contempt. We accordingly view this appeal as moot. Civil contempt,

> ... We have to have finality—and that is what we must produce here, one way or the other—finality in the procedures; that this is it and if you want to live the dream, here is your chance and you do it by midnight, May 4, and that is it and it will never come again.

*Id.* at 9293–94.

**14.** It bears mention, however, that the visaholders' complaint with the INS seemingly has nothing whatsoever to do with the district court's orders—the visaholders are quarreling about the meaning of "unlawful status," whereas the court orders concern the meaning of "known to the Government." *See Ayuda, Inc. v. Thornburgh,* Civ. Action No. 88–0625, slip op. at 3 & n. 1 (D.D.C. June 29, 1989).

unlike criminal contempt, is imposed not to vindicate the authority of the court but to enforce the rights deemed by the court as belonging to the opposing party. *See United States v. Spectro Foods Corp.*, 544 F.2d 1175, 1182 (3d Cir.1976); 11 C. WRIGHT & A. MILLER, FEDERAL PRACTICE AND PROCEDURE, Civil § 2960, at 583–87 (1973 & Supp. 1991). As we have concluded that the district court had no power to determine plaintiffs' rights in this context, there is no longer a basis for holding the government in civil contempt. *See United States v. United Mine Workers*, 330 U.S. 258, 295, 67 S.Ct. 677, 696–97, 91 L.Ed. 884 (1947) ("The right to remedial relief [for civil contempt] falls ... *a fortiori* when the injunction ... was beyond the jurisdiction of the [district] court."); *Spectro Foods*, 544 F.2d at 1182 (collateral bar rule inapplicable to civil contempt).

\* \* \* \* \* \*

We hold that the district court was without jurisdiction to issue Supplemental Order V and to order interim injunctive relief in plaintiffs' suit to extend the filing deadline. We also hold that plaintiffs' appeal of the district court's denial of their motion to hold the government in civil contempt is moot.

*It is so ordered.*

WALD, Circuit Judge, dissenting:

In 1986, Congress passed and the President signed landmark immigration legislation, the Immigration Reform and Control Act ("IRCA" or "the Act"). The Act was admittedly pragmatic, a compromise that sought both to reduce sharply illegal immigration and to provide amnesty for those who, despite their illegal status, had remained in the United States for many years.

To meet its first goal, Congress acted with authority and certainty, and imposed stiff civil and criminal penalties on employers of undocumented aliens in order to reduce the incentives for illegal immigration. To meet its second goal, Congress acted with a corresponding clemency and humanity, acknowledging that although many undocumented aliens "have become a part of their communities" and "have contributed to the United States in myriad ways," they "live in fear, afraid to seek help when their rights are violated, when they are victimized by criminals, employers or landlords or when they become ill." H.R.Rep. No. 99–682, 99th Cong., 2d Sess., pt. 1, at 49 (1986), U.S.Code Cong. & Admin.News 1986, pp. 5649, 5653. To those aliens who had endured such fear for the longest time, Congress offered amnesty.

IRCA's amnesty program opened—briefly—a window of opportunity for undocumented aliens. For one year, undocumented aliens could come forward to find out if they were eligible for legalization. Much to its credit, Congress recognized that the shadow population of undocumented aliens, long residing in constant fear of governmental authority, would be deeply suspicious of the new amnesty program, no matter how shining its promise. Therefore, IRCA included several measures designed to allay these fears and suspicions and to encourage aliens to apply for legalization.[1]

The case before us involves this amnesty program. For all of its procedural and institutional intricacies, it presents a rudimentary question: when is a district court authorized to hear challenges to the policies and practices adopted by the INS in its administration of the amnesty program? Fighting the words of the statute and the power of the controlling Supreme Court decision, the majority answers this question "almost never." Through a crabbed reading of the governing statute and case law, the majority has transformed an unprecedented act of legislative clemency into

---

1. Congress required the Attorney General to disseminate widely information about the legalization program and the requirements for obtaining adjustment of status. 8 U.S.C. § 1255a(i). Congress also directed the Attorney General to name as qualified designated entities ("QDEs") community organizations with whom the aliens had friendly relations to advise and assist aliens in the preparation of applications. *Id.* § 1255a(c)(2).

a "hall of trap doors and mirrors." [2]

## BACKGROUND

The entangled history of this case is not easily summarized. Plaintiffs—both undocumented aliens and organizations that assist aliens—filed suit in district court challenging the INS' interpretation of 8 U.S.C. § 1255a(a)(2)(B). That section sets out as one of the requirements for amnesty under the new program that "the alien's unlawful status was known to the Government as of [January 1, 1982]." The INS promulgated regulations which defined "known to the government" as "known to the INS." *See* 8 C.F.R. § 245a.1(d) (1988). The plaintiffs contended that this interpretation was too narrow and was inconsistent with IRCA. The district court agreed, granted declaratory and injunctive relief to the plaintiffs, vacated the INS regulation, and promulgated several orders to enforce its decision. *Ayuda, Inc. v. Meese,* 687 F.Supp. 650 (D.D.C.1988). The government did not appeal those rulings.

The district court's Supplemental Order I, issued on April 6, 1988, stated, in relevant part:

In order to meet the statutory standard pursuant to this Court's March 30, 1988 Order, a nonimmigrant alien must establish that prior to January 1, 1982, documentation existed in one or more government agencies so that ... *such documentation taken as a whole would warrant the finding that the nonimmigrant alien's status in the United States was unlawful.*

*Id.* at 666 (emphasis supplied). This order triggered questions about the eligibility of

a group of aliens that came to be known as the "§ 265 aliens." Former § 265 of the Immigration and Naturalization Act ("INA") required (under penalty of deportation) nonimmigrant aliens to make certain annual and quarterly filings. *See* 8 U.S.C. § 1305 (1976), *amended by* 8 U.S.C. § 1305 (1982). Apparently, however, many nonimmigrant aliens failed to make such filings.

Prior to the district court's ruling, INS regulations made clear that failure to file as required by § 265 did not render an alien "known to the government." In order to be known to the government, "the alien must have made a clear statement or declaration to [an]other federal agency" which then conveyed that information to the INS or the INS itself must have made an "affirmative determination ... that the alien was subject to deportation proceedings." 8 C.F.R. § 245a.1(d)(1)–(2) (1988). However, the district court's vacation of the INS regulation and its issuance of Supplemental Order I removed the basis for any presumption that § 265 aliens were not eligible for amnesty. Under the Supplemental Order, it could quite reasonably be argued that if "such documentation taken as a whole" included not only papers filed with the INS but also the *absence of required filings,* then § 265 aliens would fulfill the "known to the government" requirement for IRCA amnesty.

Armed with the Supplemental Order, § 265 aliens approached INS representatives but were advised not to apply for legalization, on the grounds that they did not meet the "known to the government" requirement.[3] Accordingly, several orga-

---

**2.** This phrase is borrowed from Daniel Kanstroom, *Judicial Review of Amnesty Denials,* 25 Harv.C.R.–C.L.L.Rev. 53, 64 (1990).

**3.** The majority's comment that there is no evidence that "the five individual alien plaintiffs," Majority opinion ("Maj. op.") at 751, were turned away by the INS is irrelevant. The five individual aliens were parties to the original lawsuit challenging the INS' interpretation of the term "Government" in 8 U.S.C. § 1255a(a)(2)(B) not to the § 265 intervention. *Ayuda, Inc. v. Thornburgh,* 880 F.2d 1325, 1327 (D.C.Cir.1989), *vacated and remanded,* ─── U.S.

───, 111 S.Ct. 1068, 112 L.Ed.2d 1174 (1991). The § 265 intervenors were organizations that did allege that aliens they counseled had been advised not to file. *Id.* at 1328–29.

But beyond that, the majority admits that if low level INS officials had refused outright to accept legalization applications for filing, the district court could hear the suit. Maj. op. at 751. Even if the plaintiffs' affidavits are read to allege active discouragement rather than outright refusal to accept, this is a subtle distinction indeed, and one undoubtedly lost on the illegal aliens involved, upon which to grant or deny jurisdiction to challenge the practice.

nizations that assist § 265 aliens sought to intervene in this suit in order to compel compliance with and/or to modify the district court's permanent injunction so as to clarify the eligibility of § 265 aliens. The plaintiffs adopted the intervenors' claims as their own and the district court issued Supplemental Order V on May 2, 1988.

It is hereby ordered that INS shall be enjoined from denying legalization to nonimmigrant aliens who contend that they violated their nonimmigrant status prior to January 1, 1982 by failing to comply with the mandatory ... registration requirements of Section 265 of the [INA], if INS determines that such aliens have credibly established their willful violation of Section 265, and such aliens have also met all other applicable conditions for legalization.

*Ayuda, Inc. v. Meese*, 687 F.Supp. at 668.

The government appealed this order and a divided panel of this court reversed the district court. *Ayuda, Inc. v. Thornburgh*, 880 F.2d 1325 (D.C.Cir.1989), *vacated and remanded*, — U.S. —, 111 S.Ct. 1068, 112 L.Ed.2d 1174 (1991). The Supreme Court vacated the appellate opinion for reconsideration in light of *McNary v. Haitian Refugee Center, Inc.*, — U.S. —, 111 S.Ct. 888, 112 L.Ed.2d 1005 (1991). It is this case—the government's appeal from Supplemental Order V—that, on remand, is the first of the consolidated cases before us [hereinafter *"Ayuda I"*].

But we are getting ahead of the story. By the time the district court issued Supplemental Order V, the time limit for applying for amnesty was effectively over: the Order was issued May 2, 1988, and the filing window closed on May 4, 1988. Recognizing this, the district court issued Supplemental Order IX which established amnesty-application procedures for persons who had failed to file by the May 4, 1988 deadline and who could "show [that] they were misled directly or indirectly by the INS or its agents ... or not allowed to apply or dissuaded from applying for legalization by INS or its agents." *Ayuda, Inc. v. Meese*, 687 F.Supp. at 674. Supplemental Order IX was issued on June 9, 1988,

and allowed for such filings until August 31, 1988. Approximately 6,000 persons (including both § 265 aliens and aliens filing on other bases) made such filings and the district court appointed a Special Master to evaluate the filings and to recommend possible remedies. *See* Memorandum Opinion and Supplemental Order XI (filed Sept. 27, 1988); Supplemental Order XII (filed Oct. 28, 1988). By this time, plaintiffs had filed a petition for *certiorari* with the Supreme Court seeking review of *Ayuda I*. In light of the circuit opinion in *Ayuda I*, the district court felt compelled to stay the Special Master proceedings, thereby leaving the 6,000 applicants in legal limbo. In early 1990, the plaintiffs moved for an injunction requiring the INS to provide temporary work authorization to the 6,000 applicants. The applicants averred that they had failed to file timely in reliance on advice from the INS and that had they filed timely, they would have been automatically entitled to temporary work authorization. *See* 8 U.S.C. § 1255a(a)(1), (e)(2).

After an evidentiary hearing, the district court found that the plaintiffs "are unable to obtain employment solely because they lack the requisite work authorization" and "that this inability has made it impossible for them to provide adequate food and shelter for themselves and their families." *Ayuda, Inc. v. Thornburgh*, 744 F.Supp. 21, 22 (D.D.C.1990). The court also noted that the INS had requested that the Solicitor General hold in abeyance the petition for *certiorari* in *Ayuda I* and that the Court had apparently acceded. The district court concluded that "[i]t is inequitable for [the INS] to ... delay adjudication of plaintiffs' rights without affording plaintiffs a modicum of interim relief." *Id.* For those reasons, the court issued Supplemental Order XIV which

ordered that, pending a final disposition by the United States Supreme Court of [*Ayuda I*], and further Order of this Court, the Defendant Immigration and Naturalization Service shall grant work authorization to those aliens who have been deemed eligible ... through plaintiffs' prescreening process, with the understanding that defendants may con-

test before this Court any determination of individual eligibility.

*Id.*

The government sought, and a divided panel of this court granted, a stay of Supplemental Order XIV. *Ayuda, Inc. v. Thornburgh,* 919 F.2d 153 (D.C.Cir.1990). Although *Ayuda I* was vacated by the Supreme Court on February 25, 1991, the appeal from Supplemental Order XIV remains before us as the second of our consolidated cases [hereinafter *"Ayuda II"* ].

AYUDA I. SUPPLEMENTAL ORDER V

I. *Federal Question Jurisdiction*

The initial question raised by *Ayuda I* is whether 8 U.S.C. § 1255a(f) precludes district court jurisdiction over a challenge to a general policy of the INS involving the eligibility of § 265 aliens for legalization under IRCA. I believe that this question is answered clearly by the express language of § 1255a(f) itself, the structure of the INA, and, most importantly, by the Supreme Court's controlling interpretation of an identical provision in *McNary*. These sources demonstrate that § 1255a(f) does *not* bar district court jurisdiction over collateral challenges to general policies and practices of the INS which are employed in the determination of individual applications.

A.

IRCA established two amnesty programs: a legalization program (at issue in this case) for persons who had continuously and unlawfully resided in the United States for a specified period and a Special Agricultural Workers ("SAW") program granting amnesty to alien farmworkers who met specified criteria. In *McNary*, organizations representing SAW applicants and a class of alien farmworkers challenged certain INS practices employed in processing individual applications as unconstitutional and in violation of IRCA. The government argued that 8 U.S.C. § 1160(e) precluded the district court from hearing the plaintiffs' challenge and that, pursuant to § 1160(e)(3)(A), the plaintiffs could only secure judicial review of their claims if a nonimmigrant alien were subject to "an order of exclusion or deportation," which was, in turn, subject to review in a circuit court of appeals. The district court, the Court of Appeals for the Eleventh Circuit, and finally the Supreme Court rejected the government's argument.

The Supreme Court began its analysis with the plain language of the statute. Although § 1160(e)(3) provides that "[t]here shall be judicial review of *such a denial* only in the judicial review of an order of exclusion or deportation," the Court noted that "such a denial" referred to "a determination respecting an application for adjustment of status." *See* 8 U.S.C. § 1160(e)(1) (emphasis supplied). "Significantly," the Court stated, "the reference to 'a determination' describes *a single act rather than a group of decisions or a practice or procedure."* 111 S.Ct. at 896 (emphasis supplied). Accordingly, the Court embraced the lower courts' "reading of [§ 1160(e) ] as describing the process of *direct review of individual denials of SAW status,* rather than as referring to general collateral challenges to unconstitutional practices and policies used by the agency in processing applications." *Id.* (emphasis supplied). Thus, the Court concluded, § 1160(e) did not supersede the district court's general federal question jurisdiction.[4]

[W]e hold that § 210(e) applies only to review of denials of individual SAW applications. Because respondents' action does not seek review on the merits of a denial of a particular application, the District Court's general federal question jurisdiction under 28 U.S.C. § 1331 to hear this action remains unimpaired by § 210(e).

*McNary,* 111 S.Ct. at 897.

---

**4.** My colleagues complain that neither the petitioners nor I delineate what kind of challenges are not covered by *McNary* under our interpretation. Maj. op. at 753. The short answer is that *McNary* says that any suit that might be prosecuted under general federal question jurisdiction in district court if § 210(e), or its counterpart here, *see infra* p. 764, did not exist may still be prosecuted so long as it is directed at a general policy and not an individualized determination:

The Court found further support for that conclusion in the INA's provisions concerning the scope and standard of judicial review. Section 1160(e)(3)(B), which provides that judicial review "shall be based solely upon the administrative record," serves as further indication that, in limiting judicial review in § 1160(e), Congress was concerned not with the kind of claim before the Court in *McNary*, but rather with district court review of individual amnesty applications. *Id.* Similarly, the Court observed that the statute provided that courts of appeals should review § 1160(e) cases for "abuse of discretion." *See* 8 U.S.C. § 1160(e)(3)(B). The Court found that "such a standard does not apply to constitutional or *statutory claims*, which are reviewed *de novo* by the courts" but is instead the alternative standard for "judicial review of an administrative adjudication of the facts of an individual application." 111 S.Ct. at 897 (emphasis supplied). Thus, the standard of judicial review provided in the Act further supported the Court's holding that § 1160(e) "applies *only* to review of denials of individual SAW applications." *Id.* (emphasis supplied).[5]

Finally, the Court completed its interpretive analysis by emphasizing Congress' use of narrow terms in § 1160(e). The Court compared § 1160(e)'s restriction of "judicial review of a determination respecting an application for adjustment of status" with language elsewhere in the INA which addressed judicial review of all causes "arising under" any of the provisions of a particular subchapter and with another statute which governed review "on all questions of law and fact" under a particular program. *Id.* The Court concluded that "had Congress intended the limited review provisions of § [1160(e)] of the INA to encompass challenges to INS procedures and

practices, it could easily have used broader statutory language." *Id.*

All of this leads ineluctably to the conclusion that the Supreme Court's analysis in *McNary* controls this case as well. The judicial review provision in this case (§ 1255a(f)) is identical to § 1160(e). The two sections are sister provisions in sister programs and, as the government itself concedes, the identical provisions are entitled to identical interpretations. Accordingly, it seems inevitable to me that the judicial review restriction in § 1255a(f), like § 1160(e), "applies only to review of denials of individual [amnesty] applications." *Id.*

### B.

The escape hatch from this conclusion for my colleagues is the argument that *Ayuda I* is controlled by *Heckler v. Ringer*, 466 U.S. 602, 104 S.Ct. 2013, 80 L.Ed.2d 622 (1984), a case in which the Supreme Court rejected a federal court challenge to the policy of the Secretary of Health and Human Services as to payment of benefits under Part A of the Medicare program. The *McNary* Court's own discussion of *Ringer*, however, drains that argument of all its energy. *Ringer* involved different facts, different statutory language, and fundamentally different legislative goals. In the end, neither *Ringer* nor any other authority provides an escape from *McNary*.

The plaintiffs in *Ringer* filed an action in federal district court, invoking the court's federal question jurisdiction (28 U.S.C. § 1331), to establish a right to Medicare reimbursement for a particular form of surgery. The governing statute, however, precluded judicial review under § 1331 of "*any claim arising under*" the Medicare Act. 42 U.S.C. § 405(h) (emphasis supplied). The statute required all Medicare claimants to exhaust their administrative

---

**5.** The majority's dismissal of the Court's reading of this provision of the statute, Maj. op. at 748 n. 4, misses the point. Of course an appellate court can review for mistakes of law under an abuse of discretion standard. That is not the issue. Rather, the question is whether Congress intended by enacting this particular review provision to preclude ordinary federal question review under § 1331 in the case of challenges to

the way in which the IRCA amnesty programs are being administered. The *McNary* Court answered that question in the negative. Abuse of discretion review, the Court found, suggests that Congress intended § 1160(e), and thus § 1255a(f), to govern primarily judicial review of the facts found in administrative adjudications of individual legalization applications.

remedies before seeking review in federal court. 42 U.S.C. § 405(g).

The *Ringer* Court predictably found that "it makes no sense to construe the [plaintiffs'] claims ... as anything more than, at bottom, a claim that they should be paid for their ... surgery." 466 U.S. at 614, 104 S.Ct. at 2021. Because such claims "arise under" the Medicare Act, the Court held that the district court lacked federal question jurisdiction to adjudicate plaintiffs' claims. Plaintiffs had to exhaust their administrative remedies pursuant to 42 U.S.C. § 405(g) before seeking review in federal court. *Id.* at 626–27, 104 S.Ct. at 2027–28.

Additionally and critically, however, the Court found that even though the *Ringer* plaintiffs would first have to exhaust their claims through the administrative review process, these plaintiffs "clearly have an adequate remedy in § 405(g) for challenging [in federal court] all aspects of the Secretary's denial of their claims." *Id.* at 617, 104 S.Ct. at 2023.

1. Ringer *and* Ayuda I *Involve Substantially Different Statutory Language and Legislative Goals*

The majority in this case argues that the *Ayuda* plaintiffs' federal court action is precluded by *Ringer.* A careful reading of *Ringer,* however, demonstrates that it is clearly distinguishable from *Ayuda I.* First, and most significantly, the *Ringer* Court was interpreting a different statute than the one at issue here. The IRCA provision limiting judicial review applies to "a determination respecting an application." 8 U.S.C. § 1255a(f)(1). The review provision in *Ringer,* in contrast, withdraws federal question jurisdiction from *"any* claim arising under" the Medicare Act. 42 U.S.C. § 405(h) (emphasis supplied). The "arising under" language signals a far broader statutory preclusion of ordinary federal question review than IRCA's parallel limitation of review over *"a* determination respecting *an* application." Indeed, the Court in *McNary* expressly noted this very difference, finding that had Congress intended § 1255a(f) to limit review of all

INS procedures and practices it could have used broader statutory language such as " 'all causes ... *arising under* any of the provisions' of the legalization program." 111 S.Ct. at 897 (quoting 8 U.S.C. § 1329) (emphasis supplied).

Congress' more expansive preclusion of federal question jurisdiction under the Medicare Act than under IRCA is reflected not only in the textual language but in the fundamentally different legislative goals of the two statutes. As discussed above, Congress recognized that most aliens trapped for years in an illegal status would be initially distrustful of the legalization procedures in IRCA. By providing for a network of QDEs to offer aliens accurate and confidential advice, by ensuring the confidentiality of all application information, and by mandating widespread dissemination of legalization information, Congress structured IRCA to minimize uncertainty and insofar as possible allay the fears of potential applicants. Precluding federal question review of all INS regulations or general practices would run directly contrary to these statutory policies. For it would mean that illegal aliens living in the shadows of our society would be expected to come forth and identify themselves as such, even though INS officials, by regulation or policy, were telling them they were ineligible for legalization and that the officials would recommend that their applications be denied, and even though they would have no opportunity to challenge those policies except through appeals from later deportation proceedings brought against them. Furthermore, they would be required to wait until after the statutory deadline for legalization had come and gone to find out if their applications were in fact denied, so that no "test" cases could be brought involving individual cases. Moreover, the INS could effectively control any ultimate review of its legalization policies through its discretionary authority to decide whether or not to initiate the deportation proceedings which are the only vehicle for judicial review. It is incredible to believe Congress would have played such a shabby game of "seduce and abandon" with the aliens it claimed to be benefitting.

In the Medicare Act, by contrast, Congress had no reason to fear applicants would not file for reimbursement; quite the opposite, its problem was to establish a permanent and orderly process for the millions of claims it anticipated would be filed every year. For that purpose, it "set up a scheme that requires the presentation of a concrete claim to the Secretary." *Ringer,* 466 U.S. at 625, 104 S.Ct. at 2027. The Medicare Act, according to the *Ringer* Court, was intent on balancing the individual hardship caused by uncertainty as to reimbursability "against the potential for overly casual or premature judicial intervention in an administrative system that processes literally millions of claims every year." *Id.* at 627, 104 S.Ct. at 2028. Congress' foci in the two Acts was thus very different: in IRCA to encourage legalization applications to be filed within a very short timeframe, in Medicare to regulate their flow over the long haul. To bar the *Ayuda* plaintiffs' access to federal court on the authority of *Ringer* ignores this fundamental difference between the Acts.[6]

### 2. *The* Ayuda I *Plaintiffs are Not Seeking a Substantive Declaration of Their Right to Legalization*

The majority asserts that like the suit in *Ringer,* "this lawsuit is an ... effort to adjudicate the plaintiff aliens' ultimate eligibility for legalization" as opposed to "a collateral challenge, the resolution of which does not necessarily confer eligibility." Maj. op. at 749. I disagree. These petitioners are not seeking an ultimate determination of their eligibility for legalization, only a ruling that they could not be turned away at the door because of an erroneous interpretation of the "known to the Government" requirement in the statute. What *McNary* said about the petitioners there is true here as well.

> [They] do not seek a substantive declaration that they are entitled to SAW status. Nor would the fact that they prevail on

the merits ... have the effect of establishing their entitlement to SAW status.... [They] would only be entitled to have their case files reopened and their applications reconsidered in light of the newly prescribed INS procedures.

*McNary,* 111 S.Ct. at 898.

*Bowen v. Michigan Academy of Family Physicians,* 476 U.S. 667, 106 S.Ct. 2133, 90 L.Ed.2d 623 (1986), not *Ringer,* is thus the most relevant precedent. In *Bowen,* the Court permitted a district court challenge to a rule governing the method by which Medicare benefits were calculated, even though administrative appeals had been mandated for individual reimbursement claims. The rule barred reimbursement for non-Board certified physician services, and that was also the disputed issue in plaintiffs' individual claims. Certainly no less than in the case at hand, a ruling for the plaintiffs would have gone a long way toward "establishing their entitlement" to the benefit sought. Maj. op. at 749 (quoting *McNary*). But similarly, just as individual plaintiffs in *Bowen* still had to meet many additional requirements for Medicare reimbursement, the *Ayuda* plaintiffs would have to meet the numerous other requirements for legalization in the individual application process. The mere circumstance that both the rule and an individual determination might implicate the same legal issue was not found determinative by the *Bowen* Court when one attack is directed at a general interpretative rule and the other at an individual's eligibility for specific benefits. The same result should govern here.

### 3. *The Majority's Ruling Amounts to an Effective Denial of Judicial Review for Any Substantive Challenge to the Legalization Program*

The majority argues, however, that the *Ayuda* plaintiffs, like those in *Ringer,* will eventually attain meaningful judicial re-

---

**6.** The majority's assertion that permitting district court challenges to generalized INS policies would "undercut Congress' carefully crafted scheme" for administering IRCA, Maj. op. at 749, 752 is thus off target. While such chal-

lenges might undercut administration of the Medicare Act, they affirmatively *support* the efficient administration of the IRCA legalization program.

view upon completing the individual application process, and so their situation is distinguishable from the *Bowen* plaintiffs for whom all review had been cut off. But this argument totally ignores the *McNary* Court's own dismissal of judicial review under IRCA as not only ineffective for fearful applicants, but ineffectual as well for remedying broad deficiencies in program administration.

The *McNary* Court found that in a pattern and practice action appellate review of an individual SAW application would do little or nothing to illuminate the allegedly illegal pattern or practice. An appellate court, it said, needs the factfinding capability of a district court to effectively adjudicate such claims. 111 S.Ct. at 898–99. Since *McNary*, the Ninth Circuit has picked up on this theme to find district court jurisdiction for a challenge to the pattern and practice of an Immigration Judge ("IJ") in rejecting applications. In *Campos v. Nail*, 940 F.2d 495 (9th Cir.1991), the court permitted a direct federal court challenge to an IJ's practice of rejecting all applications for change of venue made by asylum seekers from Guatemala and El Salvador. *Id.* at 496. The government argued that the claim was barred by a statute similar to § 1255a(f) that limited judicial review to appeals from individual deportation orders. The Ninth Circuit rejected this argument, noting that such claims were "difficult, if not impossible to present in an individual deportation proceeding or in review of that proceeding before this court." *Id.* at 497–98. Moreover, even if an individual alien were able to prove that his case was illustrative of an illegal pattern or practice, the individual review process would still fail to provide meaningful review because

> the only remedy available would be the reversal of that case, not an injunction. This would do little to alleviate the harm

caused to a class of persons injured by the unconstitutional practice. It is only through an action in district court that the injured class members can obtain an injunction stopping the unconstitutional practice.

*Id.* at 498 (footnote omitted).

The majority conveniently ignores the *McNary* Court's concern regarding the insufficiency of an individual application for adjudicating pattern or practice cases. The *Ayuda* plaintiffs suffer a like handicap in attempting to prove that the INS has systematically discouraged § 265 applications. Absent a direct federal court action, there is simply no way for plaintiffs in this case to prove, and seek redress of, the allegedly illegal actions of lower level INS officials in discouraging § 265 aliens from applying for legalization.[7]

The majority also argues—shortsightedly I believe—that only a legal challenge to the interpretation of the statute as opposed to a challenge to practices or procedures is involved here and that therefore the *Ayuda* plaintiffs, unlike *McNary's*, can receive adequate review through individual cases culminating in deportation proceedings appealed to the courts of appeals. Maj. op. at 749–750.

But even if the petitioner's claim were so narrowly construed, the *McNary* Court observed that

> because there is no provision for direct judicial review of the denial of SAW status unless the alien is later apprehended and deportation proceedings are initiated, *most* aliens ... can ensure themselves review ... only if they voluntarily surrender themselves for deportation.

111 S.Ct. at 898 (emphasis supplied). The Court concluded that "that price is tantamount to a complete denial of judicial review." *Id.*[8]

---

7. *Cf. El Rescate Legal Servs., Inc. v. Executive Office of Immigration Review*, 941 F.2d 950, 953 (9th Cir.1991) (recognizing the "distinction between jurisdiction to rule on the merits of an individual deportation order and jurisdiction to rule on an alleged pattern and practice of constitutional or statutory violations"); *Jean v. Nelson*, 727 F.2d 957, 980 (11th Cir.1984), *aff'd on other grounds*, 472 U.S. 846, 105 S.Ct. 2992, 86

L.Ed.2d 664 (1985) (finding district court jurisdiction to adjudicate "allegations of widespread abuse by immigration officials").

8. The Court also noted that "absent initiation of a deportation proceeding against an unsuccessful applicant [for legalization], judicial review of such individual determinations was completely foreclosed." *McNary*, 111 S.Ct. at 893.

What the Court found in *McNary* obviously applies with equal force here: "restricting judicial review to the courts of appeals as a component of the review of an individual deportation order is the practical equivalent of a total denial of judicial review of generic constitutional and statutory claims." *Id.* at 899. That is why the most relevant precedent—as the Supreme Court noted in *McNary*—is *Bowen,* not *Ringer.* *See id.* The *Bowen* Court construed the judicial review provisions of the Medicare statute to allow review of challenges to the method for calculating certain Medicare Part B payments. The Court there emphasized its "well-settled presumption favoring interpretations of statutes that allow judicial review of administrative action," *McNary,* 111 S.Ct. at 898 (citation omitted), and noted that a contrary interpretation would mean that there would be "no review at all of substantial statutory and constitutional challenges to the Secretary's administration of ... the Medicare program." *Bowen,* 476 U.S. at 680, 106 S.Ct. at 2141. Just so here.

The majority's reliance on *Ringer* is misplaced. *Ringer* involved different facts, different statutory language, and fundamentally different legislative goals. The vigor and clarity of the Supreme Court's holding is not to be dismissed, distinguished, or eluded: *"we hold that [§ 1255a(f)] applies only to review of denials of individual ... applications."* 111 S.Ct. at 897 (emphasis supplied).

At base, the majority and I differ in our vision of this case. The majority sees it as a run-of-the-mill exclusive jurisdiction case in which plaintiffs have to overcome a general presumption that a statutorily prescribed method of review in the court of appeals displaces the more general grant of federal question jurisdiction to district courts in 28 U.S.C. § 1331. Maj. op. at 750, 753. I agree with the Supreme Court in *McNary,* however, that the provision limiting judicial review of individual denials of legalization to appeals from individual deportation orders is (1) not "exclusive" of ordinary federal question jurisdiction for challenges to generalized rules and practices and (2) in real life effect, tantamount to *no judicial review at all.* In the case of no, or even fatally defective, judicial review, the burden falls on the *government* to demonstrate that Congress intended to preclude general federal question jurisdiction. The Supreme Court said as much in a case involving judicial review of the administration of an unemployment benefits program:

[w]hile the Act vested state courts with exclusive jurisdiction over claims challenging a[n] ... agency's application of federal guidelines to the benefit claims of individual employees, *there is no indication that Congress intended [the relevant statute] to deprive federal district courts of subject-matter jurisdiction under 28 U.S.C. § 1331(a) ... to hear* statutory or constitutional challenges to the federal guidelines themselves. Indeed, we have frequently upheld a contrary principle: that although review of

---

Thus it is conceivable that a problematical ruling in legalization proceedings could escape review completely if the government chose not to initiate deportation in all such cases. The aliens involved, however, would lose all benefits of the Act since they would be denied work authorization, and in the words of the *McNary* Court, be "in an even worse position than [they were] in before the Reform Act was passed because lawful employment opportunities are no longer available to such persons." *Id.* at 895.

"Despicable" or not, Maj. op. at 751, a case currently before this court demonstrates that government agencies have been known to avoid any nationally applicable test of their statutory interpretations by refusing to petition for Supreme Court review of adverse circuit court rulings in individual appeals at the same time they continue to apply the rejected interpretation not only in other circuits, but to other individuals' claims in the same circuit. *See, e.g.,* Brief of Petitioner–Appellant at 3–4, 15–16, Johnson v. United States R.R. Retirement Bd., Nos. 90–1243, 90–5380 (D.C.Cir. filed Aug. 12, 1991) (discussing non-acquiescence by Railroad Retirement Board); Brief of Respondent–Appellee at 19, *Johnson* (D.C.Cir. filed Sept. 12, 1991) (same); Appendix at 38, *Johnson* (D.C.Cir. filed Aug. 12, 1991) (dissenting opinion of Railroad Retirement Board member criticizing non-acquiescence by Railroad Retirement Board).

At any rate, the point of the caveat is that Congress would hardly have devised a scheme that left illegal aliens under such time constraints on legalization applications so much at the mercy of immigration officials' discretion.

individual eligibility determinations in certain benefit programs may be confined by ... federal law to state administrative and judicial processes, claims that a program is being operated in contravention of a federal statute or the Constitution can nonetheless be brought in federal court. *Cf. Bowen v. Michigan Academy of Family Physicians, ...*

*International Union, UAW v. Brock,* 477 U.S. 274, 285, 106 S.Ct. 2523, 2530, 91 L.Ed.2d 228 (1986) (emphasis supplied) (citations omitted).

The presumptive shoe is thus on the other foot. Contrary to the majority's pervasive assumption, the right to mount a federal question challenge to general administrative policies or practices of the INS remains unless Congress signals otherwise.[9] And *McNary* made it superclear that Congress did not make that judgment here. "The strong presumption in favor of judicial review of administrative action is not overcome by either the language or the purpose of the relevant provisions of the Reform Act." *McNary,* 111 S.Ct. at 899. In my view then, there is no other conclusion possible but that the district court had jurisdiction to adjudicate plaintiffs' challenge to the INS' administration of the IRCA legalization program.

## II. *Ripeness and Finality*

Passing on now to my colleagues' second ground for denying the *Ayuda I* plaintiffs

jurisdiction, the government argues and my colleagues agree that because the INS has not yet undertaken final agency action on the disposition of IRCA applications by § 265 aliens, the case is unripe.[10] In my view, this argument sweeps too broadly. Although finality and ripeness concerns may prohibit the district court from preempting the INS' primary authority to interpret IRCA and to rule on the eligibility of § 265 aliens, such concerns do not bar the district court from taking measures designed to ensure that the agency's delayed action does not irreparably prejudice the plaintiffs and does not destroy the district court's ultimate jurisdiction.

The purpose of ripeness doctrine is to "prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies" and to "protect agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." *Abbott Laboratories v. Gardner,* 387 U.S. 136, 148–49, 87 S.Ct. 1507, 1515, 18 L.Ed.2d 681 (1967). *Abbott Laboratories* directs us to examine two factors: "the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Id.* at 149, 87 S.Ct. at 1515.[11]

In this case, the government does not dispute that the plaintiffs present a "case

---

**9.** *Lujan v. National Wildlife Federation,* —— U.S. ——, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990), which the majority cites for the proposition that there is no "general right ... to challenge agency ... interpretation of regulations facially rather than on an as-applied, case-by-case basis," Maj. op. at 750, is not to the contrary. In *Lujan,* plaintiffs mounted an attack on the administration of an entire program which consisted of approximately 1250 individual agency actions and determinations. *Id.* 110 S.Ct. at 3189. The Court rejected this attempt to seek *"wholesale* improvement" of a government program through the courts, but explicitly found that "[i]f there is in fact some specific order or regulation, applying some particular measure across-the-board ... it can of course be challenged under the APA by a person adversely affected...." *Id.* at 3190 & n. 2 (emphasis in original).

**10.** I have read my colleagues' critique of my refutation to their argument that the plaintiffs'

challenge is not ripe for review. Insofar as I understand it, I find their reasoning circular, *i.e.,* because the district court could never have jurisdiction, even if there were final agency action, it could do nothing to preserve that jurisdiction. Obviously, as hopefully the prior pages have established, the district court did have Article III " "case or controversy" jurisdiction which it could preserve until the agency had taken its final substantive cut on the matter.

**11.** This first factor parallels and complements the Administrative Procedure Act's general requirement that agency action be "final" prior to judicial review. *See* 5 U.S.C. § 704. As we have often noted, ripeness and finality "tend to converge in that both are meant to prevent premature judicial intervention in the administrative process." *Public Citizen Health Research Group v. FDA,* 740 F.2d 21, 30 (D.C.Cir.1984).

or controversy"; § 265 aliens seek and have been discouraged from applying for IRCA legalization. To this constitutionally mandated extent, the plaintiffs' challenge is suitable for judicial review. But unlike the plaintiffs' initial challenge to 8 C.F.R. § 245a.1(d) (the "known to the government" regulation) the § 265–related challenge does not involve a *regulation*. Moreover, the INS' Legalization Appeals Unit ("LAU") has not yet articulated the agency's policy with regard to § 265 IRCA applicants.[12] Therefore, the government argues, it cannot be said that the INS has taken a final agency position on the eligibility of § 265 aliens and the case is not ripe for review.

Although the majority appears content to end its analysis here, I believe that *Abbott Laboratories* and the weight of circuit precedent require more. "[W]hen disinclined to find finality, 'we must then weigh this consideration against the immediate impact of the actions on the challengers, and whether that impact is so harmful that present consideration is warranted.'" *Public Citizen Health Research Group v. FDA*, 740 F.2d 21, 30 (D.C.Cir.1984) (quoting *Midwestern Gas Transmission Co. v. FERC*, 589 F.2d 603, 618 (D.C.Cir.1978)).

This second factor—"the hardship to the parties of withholding court consideration"—militates strongly in favor of a finding of ripeness in this case. Absent judicial action, the period for filing for IRCA legalization would have ended and thousands of persons would have lost their chance for amnesty. In purely human terms, it is difficult—perhaps impossible—for those of us fortunate enough to have been born in this country to appreciate fully the value of that lost opportunity. For undocumented aliens, IRCA offered a one-time chance to come out of hiding, to stop running, to "belong" to America. The hardship of withholding judicial review is as severe as any that I have encountered in more than a decade of administrative review.

In short, then, while one of the *Abbott Laboratories* factors (hardship) points toward ripeness, the other (fitness and finality) points away. Facing a similar conflict in *Public Citizen*, we concluded that hardship

> will rarely overcome the finality and fitness problems inherent in attempts to review tentative positions.... A tentative agency position will not generally be in a form susceptible of review ... and, perhaps more importantly, ... review is at odds with fundamental notions of administrative law that generally require the agency to resolve substantive issues in the first instance.

740 F.2d at 31. The same principle applies in this case: the doctrines of ripeness, finality, and judicial deference to lawful agency interpretations all indicate that the courts should give the INS the first opportunity to determine the eligibility of § 265 aliens.

But—as we explained in *Public Citizen*—"[t]hat determination does not ... close the book on this case." *Id.* at 34. Even though the court may not ordinarily substitute, in the first instance, its own judgment of the way a statute should be interpreted or applied for that of an agency, a court may keep watch over the *timing* of agency action. Notwithstanding a lack of finality, "courts are certainly not without power to address the interests of a regulatory beneficiary ... when unwarranted agency delay prejudices those interests." *Id.* at 32. Accordingly, in *Public Citizen* we went on to observe that the "record strongly suggests that the pace of agency decisionmaking is unreasonably dilatory" and remanded to "the District Court to take evidence and rule initially on whether the agency response ... ha[d] been 'unreasonably delayed.'" *Id.* at 34–35. This conclusion comports with *Abbott Laboratories'* direction that doctrines of finality and ripeness be applied in a "flexible" and "pragmatic" manner. *Abbott Laborato-*

---

**12.** This inaction, of course, is fully understandable: until the district court vacated § 245a.1(d), that regulation clearly precluded amnesty on the basis of failure to meet § 265 filing requirements.

*ries,* 387 U.S. at 149–50, 87 S.Ct. at 1515–16.

*Public Citizen* clearly establishes that a lack of finality in a context in which continued delay would impose grave harm does not totally divest a court of jurisdiction. Absent final agency action, a court may lack the authority to preempt an agency's primary jurisdiction to interpret the substantive statute, but it still retains the jurisdiction to oversee the agency's actions, under, for example, § 706(1) of the Administrative Procedure Act (5 U.S.C. § 706(1)) (as was the case in *Public Citizen*).

This authority is essential to protect the court's prospective jurisdiction. Thus when intervening events are likely to deprive a court of its jurisdiction, the All Writs Act authorizes the court to "issue all writs necessary or appropriate in aid of [its] ... jurisdiction[ ]." 28 U.S.C. § 1651(a). In an analogous context, we noted that such authority is not limited " 'to the issuance of writs in aid of jurisdiction already acquired ... but extends to those cases which are within [the court's] appellate jurisdiction although no appeal has been perfected.' " *Telecommunications Research and Action Center v. FCC,* 750 F.2d 70, 76 (D.C.Cir.1984) (*"TRAC"*) (quoting *Federal Trade Commission v. Dean Foods Co.,* 384 U.S. 597, 603–04, 86 S.Ct. 1738, 1742–43, 16 L.Ed.2d 802 (1966) (internal quotations omitted)). Accordingly, in *TRAC,* we held that the All Writs Act "empowers a federal court to issue writs of mandamus necessary to *protect its prospective jurisdiction.*" 750 F.2d at 76 (emphasis supplied). The district court in this case exercised an analogous power by establishing a mechanism for the collection of applications filed by those who claimed that, in not filing within the statutory period, they had relied on the INS' unlawful regulations and representations.

The timing of the district court's initial and unappealed ruling vacating the INS' "known to the government" regulation on March 30, 1988, meant that the INS would not have the opportunity to take a final agency position on the eligibility of the § 265 aliens before the 12–month filing period ended on May 4, 1988. Until the agency took such final action, the district court could not rule on the legality of that action. Thus, if the district court did not act, the inaction of the INS and the passage of time would conspire to destroy the district court's jurisdiction over the claims of the § 265 aliens. In such circumstances, the district court has the equitable authority to take action to preserve its prospective jurisdiction and thereby to preserve its authority to review the legality of the INS' policies and practices.

The exercise of that equitable power in this situation is wholly appropriate. The harm to the plaintiffs of withholding judicial review is imminent, severe, and irreparable; the interim relief is consistent with the public interest as articulated in IRCA; and the time pressures that urge relief arise through no fault of the plaintiffs.[13] In such circumstances, I believe that the district court properly and soundly exercised its long-recognized power "to adapt[ the initial injunction] as events may shape the need." *United States v. Swift & Co.,* 286 U.S. 106, 114, 52 S.Ct. 460, 463, 76 L.Ed. 999 (1932).

Supplemental Order V is properly tailored to suit the court's limited power in the absence of final agency action. The Order does not substitute the court's judgment for that of the INS in determining the eligibility of § 265 aliens; the Order is strictly *prohibitory:* it "enjoin[s the INS] from *denying* legalization" to § 265 aliens—it does not require the INS to grant legalization. *Ayuda, Inc. v. Meese,* 687 F.Supp. at 668. As subsequent Orders indicate, the district court recognized the limits of its authority and served not as a surrogate of the agency but rather as a collector of constructively filed applications.[14] The district court did not order the

---

**13.** With regard to this latter fact it is important to recognize that the § 265 issue arose directly from the district court's ruling that the INS' "known to the government" regulation was invalid.

**14.** The interim character of the district court's action is also evident in its instruction that such

legalization of any aliens, but merely preserved the status quo by accepting and holding applications from applicants who averred that they would have filed but for the INS' unlawful regulations. Such an action provided the INS time to develop a policy on the eligibility of § 265 aliens in light of the vacation of its initial "known to the government" regulation. Such actions are fully consistent with the court's limited power to preserve its own prospective jurisdiction and with its established authority to modify its own injunctions to adapt to unforeseen circumstances.

In sum, *McNary* establishes that IRCA does not preclude district court review of collateral challenges to INS regulations, policies, or practices. Therefore, the district court in this case properly exercised its federal question jurisdiction. Moreover, although the challenge raised by the § 265 aliens may not have been ripe by ordinary standards, such unripeness did not divest the court of jurisdiction. Instead, under well-established circuit law, the court retained the power to preserve its own prospective jurisdiction. Supplemental Order V did precisely that and therefore that Order, in my opinion, should be affirmed.

### AYUDA II. SUPPLEMENTAL ORDER XIV

The original complaint in this litigation was filed on March 8, 1988. Two years later little had changed: the district court had issued a dozen Orders, the government had appealed twice to the court of appeals, and still 4,000 to 6,000 persons waited for their rights to be adjudicated. As they waited their situation grew more and more desperate. The INS enforced IRCA's new employer sanctions, and the aliens lost their primary source of income—their jobs. They cut their expenses, drew upon their savings, some borrowed money from their friends or from churches or charities. Despite such generosity, many were left without the bare necessities: food, clothing, shelter.

In April 1990—more than 25 months after the litigation began—the plaintiffs sought interim relief. Their argument was straightforward and potent. If the INS had properly interpreted IRCA's "known to the government" requirement, these persons would have filed for legalization. If these persons had filed for legalization, they would have automatically been granted temporary work permits. The district court agreed and issued Supplemental Order XIV which required the INS to grant work authorization to aliens who had filed under Supplemental Order IX.

### I. *Mootness*

This case is before us in a strange posture. We are asked to review the district court's order of "interim relief" *after* that relief has come to an end. Supplemental Order XIV provided relief "pending a final disposition by the United States Supreme Court of *Ayuda, Inc. v. Thornburgh,* No. 89–1018." *Ayuda, Inc. v. Thornburgh,* 744 F.Supp. at 22.[15] It is undisputed that such final disposition was granted February 25, 1991. Therefore, I believe the appropriate action is to dismiss the *Ayuda II* appeal as moot and to remand this matter to the district court to vacate the Order. *See United States v. Munsingwear, Inc.,* 340 U.S. 36, 39–40 & n. 2, 71 S.Ct. 104, 106–07 & n. 2, 95 L.Ed. 36 (1950).

I feel compelled, however, to make one further observation. This is the third time in three years that this litigation has been before this court and the litigation has lasted more than three times the length of the amnesty program itself. While I admire the tenacity of counsel for both sides, I suspect that this litigation might, sadly, itself become moot of "natural causes": with no means for support and little hope of legalization, the thousands of aliens who pressed their claims may be forced to leave

---

filings be accepted without the statutorily required filing fee in order to prevent aliens from forfeiting the fee should Supplemental Order V be reversed on appeal. *See* 687 F.Supp. at 668.

**15.** The Order does condition the interim relief as "pending ... further Order of this Court." 744 F.Supp. at 22. But that phrase, it seems to me, is simply the boilerplate language of interim relief: only the issuing court can vacate its own Order.

the country, their rights unadjudicated, their status determined not by law but by necessity.

## II. *Abuse of Discretion*

Even if I were to reach the merits of the district court's Order, I believe that it cannot reasonably be said that that court abused its discretion in ordering interim relief.

The factors the district court considers are familiar: (1) the plaintiffs' likelihood of success on the merits; (2) the threat of irreparable injury to the plaintiffs absent interim relief; (3) the possibility that the relief will cause substantial harm to others; and (4) the public interest. *Ambach v. Bell,* 686 F.2d 974, 979 (D.C.Cir.1982).

The government and the majority rely most heavily on the first of these factors. The majority emphasizes 8 U.S.C. § 1255a(f)(2), which provides that:

> No denial of adjustment of status under this section based on a late filing of an application for such adjustment may be reviewed by a court of the United States....

The majority, however, jumps the gun. The district court was not "reviewing" a "denial" of adjustment of status, it was merely preserving the status quo. This section would come into play—and the apprehensions of the majority be sound—only upon the occurrence of several events. *First,* the district court must direct the INS to consider the collected applications as constructively promptly filed (filed *nunc pro tunc* as suggested by the Special Masters). *Second,* a Legalization Office ("LO") must refuse to do so and instead reject the applications as late filed. *Third,* the LAU must affirm that determination. *Fourth,* upon a collateral challenge to the LAU's ruling, a federal court must interpret § 1255a(f)(2) as barring such *nunc pro tunc* filings. If and only if these events occur will the plaintiffs fail to succeed on the merits.

I do not agree with my colleagues that the probability of all four of the required events occurring is so high as to offer the plaintiffs only a minimal likelihood of success on the merits. Accordingly, I do not agree with my colleagues either that the district court abused its discretion in ordering the interim relief necessary to feed, clothe, and shelter the thousands of aliens and their families whose only request is a chance to have their legal claims heard.[16]

## CONCLUSION

The AYUDA plaintiffs must truly know the meaning of having defeat snatched from the jaws of victory. My colleagues' earlier decision denying jurisdiction over their claims was vacated by the Supreme Court and the case remanded for "reconsideration in light of" *McNary. McNary* was a plain-speaking interpretation by the Supreme Court that the provision we revisit today restricting judicial review did not apply to generalized challenges like theirs.

---

**16.** I also dissent from the holding of the panel that plaintiffs' appeal in *Ayuda III* is now moot. As summarized by the majority, Maj. op. at 759, plaintiffs appealed the district court's denial of their motion to hold the government in contempt for denying the legalization applications of "A" and "G" non-immigrant visa holders. The government has moved that this appeal be dismissed on the alternative grounds that the district court lacked jurisdiction to hear plaintiffs' motion and that the denial of plaintiffs' motion was not an appealable final order.

I believe the district court had jurisdiction to hear plaintiffs' motion so that the issue before us is whether the court's order was appealable as a final order. In my view, the district court's order denying plaintiffs' motion to hold the government in contempt was an appealable or-

der. Even where the underlying litigation has not been concluded, civil contempt adjudications arising from permanent injunctions are considered post-judgment proceedings and may be immediately appealable under 28 U.S.C. § 1291. *See New York v. Shore Realty Corp.,* 763 F.2d 49, 51 (2d Cir.1985); *New York State Urban Dev. Corp. v. VSL Corp.,* 738 F.2d 61, 64 (2d Cir.1984). I would therefore deny the government's motion to dismiss plaintiffs' appeal.

Along with my colleagues, however, Maj. op. at 759 n. 14, I too note that the dispute over the status of "A" and "G" nonimmigrant visa holders apparently revolves around the INS' interpretation of a different aspect of § 1255a(a)(2) than the "known to the government" provision that was the basis of the trial court's orders in *Ayuda I* and *Ayuda II.*

*McNary* has, however, now been subjected to a revisionist interpretation in order to deny them relief on basically the same grounds as before. Three years of a dedicated trial judge's painstaking efforts to bring reason and justice to one of our most troubled national problems have been erased with the stroke of a pen.

I dissent from what I sincerely believe to be a wrong interpretation of the statute, compounded by an unnecessarily cramped interpretation of the Supreme Court's efforts to implement it. The injury to rational principles of statutory interpretation and controlling precedent by today's decision is surpassed only by the human suffering involved in turning away 6,000 applicants for amnesty without a hearing.